FLYNN v KORNEFFEL

Docket No. 99238. Argued December 7, 1995 (Calendar No. 7). Decided
April 30, 1996. Rehearing denied 453 Mich 1201.

Wendell C. and Margaret A. Flynn sought to redeem their interest in
certain real property that they were buying on land contract from
Curtis G. and Maureen A. Korneffel, successors in interest to vari-
ous vendors, following the entry of a judgment of forfeiture by the
33rd District Court, Donald L. Swank, J. The Flynns neither
answered the complaint nor defended their interest in the summary
proceedings. A week before the expiration of the redemption
period, the Flynns scheduled a closing at a title company, but
informed the vendors' attorney only on the morning of the closing.
When neither Mr. Korneffel nor his attorney appeared at the clos-
ing, the Flynns placed a check for the redemption amount in
escrow with the title company, and hand delivered a letter to the
Korneffels and their attorney that payment was conditioned on
delivery of a warranty deed along with mortgage discharges.

The next day, the Korneffels obtained a writ of restitution in the
district court. On the following day, the Flynns brought an action in
the Wayne Circuit Court against the Korneffels to enforce their
right of redemption. The court, Roland L. Olzark, J., restrained
enforcement of the writ of restitution and, after a hearing, deter-
mined that because the proceedings originated in district court, the
Flynns should return to that court to pursue their remedy. There-
after, the district court denied the Flynns' motion to set aside the
default judgment, the circuit court dissolved its preliminary injunc-
tion and enforced the writ of restitution, and the district court, sua
sponte, subsequently dismissed a motion by the Flynns to enforce
the right of redemption, stating that it did not have jurisdiction to
hear the motion. Ultimately, the circuit court restrained the Kornef-
fels from enforcing the district court writ of restitution and denied
them summary judgment.

The Court of Appeals, MICHAEL J. KELLY, P.J., and MACKENZIE and
BRENNAN, JJ., affirmed in an unpublished opinion per curiam, and
remanded the case to the district court for further fact finding
(Docket No. 125687). On remand, the district judge enforced the
writ of restitution. After remand, the Court of Appeals stated that
the judgment of forfeiture was properly entered and ordered that

the writ of restitution be enforced against the Flynns, extinguishing any right of redemption that the Flynns may have claimed under the land contract. The Flynns appeal.

In an opinion by Justice RILEY, joined by Chief Justice BRICKLEY, and Justices BOYLE and WEAVER, the Supreme Court *held*:

The Korneffels did not perpetrate fraud in obtaining the writ of restitution. In order to effectuate the right of redemption, the full amount, not merely an offer, must be tendered without qualification or condition. The Flynns' placement of the judgment amount in escrow was merely an offer to redeem the property.

1. The equitable right of redemption is governed by MCL 600.5744(6); MSA 27A.5744(6). A vendee in default is provided ninety days in which to redeem where less than fifty percent of the purchase price has been paid. The entire balance is due within that period. Deviation from the statutory provisions is justified only under unusual circumstances, such as fraud, which must be proved by clear and convincing evidence.

2. Pursuant to the statute and applicable case law, the Flynns could have tendered the money required to redeem to the Korneffels in person or by mail by the end of the last day of the redemption period. Neither a reasonable closing date nor a time was ever communicated or agreed upon, however. Instead, the Flynns unilaterally scheduled a closing and notified the Korneffels at the eleventh hour. In addition, Mr. Flynn did not tender payment within the statutory period, and the district court found that Mr. Korneffel and his attorney did not refuse to make themselves available for payment. The placement of the redemption money into escrow under the particular circumstances of this case did not effectuate a redemption because the money was not "paid" to the Korneffels.

Affirmed.

Justice LEVIN, joined by Justices CAVANAGH and MALLETT, dissenting, stated that when the amount required to be paid to redeem from a forfeiture is not a periodic installment, but represents the entire unpaid balance of principal and interest, the vendor is obliged to deliver to the vendee—simultaneously in exchange for receipt of the amount required to fully pay the contract and to redeem from the forfeiture—a warranty deed conveying to the vendee a marketable title of the premises and discharges of any encumbrances created by the seller.

The land contract in this case expressly obliged the Korneffels to deliver to the Flynns a warranty deed of conveyance free from all encumbrances upon payment in full of all sums owing on the land contract. Absent delivery of such a deed and discharges of the mortgages, the Flynns would not have a marketable title justifying

disbursement of the money by Lawyers Title. The Flynns needed and were justified in requiring simultaneous delivery of the deed and discharges because the land contract expressly provided that, upon full payment, the seller would convey a marketable title. This, coupled with the obligation implicit in contracts generally of good faith and fair dealing, obliged the Korneffels minimally to have available in the lawyer's office such a deed and discharges to be exchanged for a Lawyers Title check.

The law provides that a vendee may insist on performance of an act by the vendor that is to be concurrent with payment in full by the vendee. The tender by Lawyers Title in behalf of the Flynns imposed no stipulation other than performance by the Korneffels of their contractual obligations to convey a marketable title upon receipt of full payment, a stipulation that the Flynns were legally entitled to impose. Because the stipulation concerned only the Korneffels' express obligations under the contract, the tender was sufficient to redeem.

Justice CAVANAGH, dissenting, stated that an installment land contract vendor has a limited duty to cooperate with a vendee's attempts to redeem the property from forfeiture when the vendee is ready, willing, and able to effectuate redemption but for commercially reasonable conditions imposed by a third-party lender, and the conditions attached to the tender are a result of the vendor's use of the property after executing the land contract.

When the sale of land is accomplished through the use of an installment land contract that provides for a balloon payment, it is not unreasonable to expect that the vendee will not be able to make the balloon payment absent obtaining another loan. Accordingly, a vendor should be on notice that a commercial lender will not loan funds sufficient to cover a balloon payment without proof of clear title. More importantly, where, as in this case, the vendor seeking forfeiture has created a postexecution cloud on the title that prevents the vendee from obtaining an unconditional loan to cover the default judgment, it would be manifestly unfair to allow the vendor to refuse to cooperate with the vendee's redemption attempts and then reap the rewards of forfeiture by recovering the property in its improved condition as well as by keeping the payments already made. Tender should be excused. Unconditional tender was unnecessary because the vendees were ready, willing, and able to tender before the redemption period had expired but for the conditions imposed by their lender as a result of the vendors' postexecution actions and because the vendors refused to cooperate in satisfying those conditions.

*Philip A. Gillis* for the plaintiffs.

*Sean P. Kavanagh* and *Murphy, Brenton & Spagnuolo, P.C.* (by *Frederick J. Griffith, III*), for the defendants.

RILEY, J. We granted leave to determine whether a writ of restitution issued by the 33rd District Court in this land contract forfeiture proceeding is enforceable. Specifically, we must decide whether the land contract vendees in default were prohibited by fraud from redeeming the property in question. Alternatively, we must determine whether the vendees exercised their statutory right of redemption by placing the default amount in escrow with a title insurance company on the afternoon of the last day of redemption.[1] We are unable to conclude, on the facts of this case, that the vendors perpetrated fraud in obtaining the writ of restitution. Furthermore, in order to effectuate the right of redemption, the full amount, not merely an offer, must be tendered without qualification or condition. *Kaiser v Weber,* 301 Mich 609; 4 NW2d 29 (1942). Plaintiffs' placement of the judgment amount in escrow was merely an offer to redeem the property. We therefore affirm the decision of the Court of Appeals.

I

On February 1, 1980, Michael and Marylou Baghdoian purchased a large residence situated on a valuable parcel of waterfront property on land contract from Sam and Pamela Piunti. Plaintiffs in the present proceeding, Wendell and Margaret Flynn, pur-

---

[1] MCL 600.5744(6); MSA 27A.5744(6).

chased the Baghdoians' interest and are the current vendees of the land contract.[2] Subsequently, plaintiffs failed to pay a $376,040.71 balloon payment that became due on February 1, 1988.[3]

Thereafter, the vendors, the Piuntis, declared the contract forfeit and began summary proceedings in the 33rd District Court. The Flynns neither answered the complaint nor defended their interest in the summary proceedings. On March 30, 1988, the district court entered a judgment of forfeiture and possession for breach of land contract. After entry of default, plaintiffs' ninety-day period of redemption commenced.[4] To perfect this right, plaintiffs were obligated to pay approximately $450,000, inclusive of unpaid real estate taxes. While these proceedings were pending, the current defendants and vendors, Curtis and Maureen Korneffel, purchased the Piuntis' interest and were substituted in the summary proceedings action. The redemption period was scheduled to expire June 28, 1988.

---

[2] The Flynns also purchased an adjacent lot not subject to the land contract in question in the present case. The Flynns previously defaulted on this piece of property, but redeemed it subsequent to forfeiture proceedings.

[3] The Flynns had not only defaulted in making the final balloon payment, but had also failed to make monthly payments on the land contract, and had not paid real estate taxes on the property for a series of years.

[4] MCL 600.5744(3); MSA 27A.5744(3) provides:

When the judgment for possession is based upon the forfeiture of an executory contract for the purchase of the premises, the writ of restitution shall not be issued until the expiration of 90 days after the entry of judgment for possession if less than 50% of the purchase price has been paid or until the expiration of 6 months after the entry of judgment for possession if 50% or more of the purchase price has been paid.

The facts surrounding the attempted redemption and subsequent procedural history are lengthy but important to the disposition of this case.[5] During the redemption period, plaintiffs were able to obtain a loan from a third party, Consumers Petroleum Company, to redeem the property. A week before expiration of the redemption period, Mr. Flynn arranged a closing at Lawyers Title Insurance Company in Troy, Michigan. The closing was tentatively scheduled for June 28, 1988, the last day of redemption.[6] During this time, it was discovered that the property in question had previously been encumbered.[7]

---

[5] The ensuing factual history is based on the district court's findings of fact on remand from the Court of Appeals. Unpublished opinion of the 33rd District Court, issued August 12, 1993. A trial court's findings of fact are subject to considerable deference on review. MCR 2.613(C) states:

Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.

Unable to find clear error, we uphold the district court's findings of fact. See also *Beason v Beason*, 435 Mich 791, 799-803; 460 NW2d 207 (1990).

Justice LEVIN's dissent nevertheless purports to make its own findings of fact when it bases its decision in substantial part on the fact that the Korneffels did not uphold their general duties to perform in " 'good faith' " and of " 'fair dealing.' " *Post* at 212-213. This assertion is belied by the express finding of the district court that neither Korneffel nor his attorney "exhibited bad faith."

[6] Flynn did not tell his attorney, Anthony Smereka or Mr. Korneffel that he had arranged the closing.

[7] Wendell Flynn ordered a title commitment on June 24, 1988. It is undisputed that the commitment showed that the property was used by the Piuntis as collateral for several mortgages to Trenton Bank and Trust Company. The mortgages amounted to a cumulative sum of approximately $505,000. Additionally, the commitment showed an assignment of the seller's interest in the land contract to Trenton State Bank as collateral for a $425,000 loan. It is unclear whether this was additional security for the existing loans or security for a new loan. The title commitment also showed that Mr. Flynn deeded his interest in the subject property to Joe Stewart as security for a loan in the sum of $189,500.

One day before the expiration of the redemption period, on the afternoon of June 27, 1988, Mr. Flynn made a telephone call to Mr. Korneffel and told him that he had the money to redeem the property and would do so the following day.[8] Mr. Flynn also advised Mr. Korneffel that he had a title commitment for the property and asked Mr. Korneffel whether he had the discharges of the mortgages. Mr. Korneffel replied that the mortgages had been paid. Mr. Flynn called Mr. Korneffel's attorney, Anthony Smereka, but he was out of town.[9]

---

However, a recorded warranty deed from the Piuntis to the Korneffels indicated that the mortgages, as well as the back taxes, had been paid. *In fact, Flynn had been told by Lawyers Title that a deed without restrictions had been recorded from the Piuntis to the Korneffels, which evidenced that the mortgages had been discharged.*

[8] However, the evidence at the fact-finding hearing showed that Flynn *did not* have the money to redeem in his name or at his immediate disposal at the time this call was made.

[9] Plaintiffs assert that defendants' attorney, Anthony Smereka, should not have been allowed to testify at the remand hearing because Mr. Korneffel previously asserted an attorney-client privilege when Smereka was noticed for deposition. In letters to plaintiffs' counsel, Philip Gillis, dated September 21, 1988, and March 27, 1989, defendants' counsel, Leo Carrigan, Jr., did not assert the attorney-client privilege, but rather inquired about what matters Gillis expected to question Smereka. It appeared that the information was essential to Mr. Korneffel in order to determine whether to exercise a valid waiver of the privilege. There is no evidence in the record that Gillis responded to the letters. Therefore, the attorney-client privilege was not clearly asserted by Mr. Korneffel.

Moreover, we agree with the district judge on remand. In allowing Smereka to testify at the evidentiary hearing, the judge noted that no final decision had been made by the circuit court with regard to Mr. Korneffel's attorney-client privilege. Therefore, it was not finally determined that he could claim the privilege. The judge stated that the privilege would not likely apply to all contact between Mr. Korneffel and Smereka. The judge further noted that Smereka had considerable contact with third parties that would not be subject to an attorney-client privilege. Finally, Smereka was called as an adverse witness at the evidentiary hearing by *plaintiffs, the Flynns.* For these reasons, we conclude that the district judge properly allowed Smereka to testify at the evidentiary hearing.

Mr. Flynn returned the call to Smereka the following morning between 9:30 and 10:00 A.M.[10] Mr. Flynn told Smereka that he wanted both him and Mr. Korneffel to attend a closing in Troy. Mr. Flynn advised Smereka that he had a title insurance commitment that revealed undischarged mortgages and requested a warranty deed discharging the mortgages. Smereka was surprised that the discharges had not been recorded and told Mr. Flynn that he would investigate the problem and call him back in an hour.

The telephone conversation continued, however, and Smereka further inquired about the redemption money. Smereka told Mr. Flynn to tender the money if he had it and he would receive whatever was necessary for clear title. Although Mr. Flynn had set up the closing and made arrangements to borrow the redemption money a week earlier, he did not tell Mr. Korneffel or his attorney about the closing until this conversation on the morning of June 28, 1988.[11] Smereka apparently hung up abruptly and did not call back.

After the telephone conversation, Smereka went on a previously arranged shopping trip with his wife.[12] Before leaving, he advised his client of his telephone

---

[10] Upon his return on the evening of June 27, 1988, Smereka attempted to return Mr. Flynn's call. Mr. Flynn was not home, therefore Smereka left a message.

[11] During their conversation that morning, Mr. Flynn still did not communicate any details of the closing because the third-party loaner had not yet turned the money over to Lawyers Title Insurance Company. Mr. Flynn testified that he did not want to discuss the details with Mr. Korneffel or Smereka until he had the cashier's check in his possession.

[12] There was no evidence from which the district court on remand could conclude that Smereka intentionally made himself unavailable for purposes of redemption.

conversation with Mr. Flynn.[13] Mr. Korneffel left his office, but told his staff to accept the redemption money from Mr. Flynn. Mr. Flynn later left several messages on Smereka's answering machine, advising him of the details of the closing for the first time. The closing was set for 2:00 P.M. that afternoon at Lawyers Title Insurance Company in Troy.[14] Smereka did not learn these details until late in the afternoon when he checked his answering machine.

When it was clear that neither Smereka nor Mr. Korneffel would appear at the closing, plaintiffs placed a check for the redemption amount in escrow with Lawyers Title. At Mr. Flynn's request, Mr. Brinkman from the Lawyers Title Insurance Company prepared a letter late in the afternoon on June 28, 1988, addressed to Anthony R. Smereka at his office/residence in Northville, Michigan. The letter advised Smereka that the Flynns appeared at the office of Lawyers Title Insurance Company on that date and placed in escrow the sum of $466,510.95, plus additional money to compensate for any discrepancies. The letter conditioned payment on delivery of a warranty deed from the Korneffels along with mortgage discharges to Brinkman's office. Mr. Flynn then took a copy of the letter to the residences of Smereka and the Korneffels.[15]

---

[13] Smereka told Mr. Korneffel that he did not have to attend the closing and that he was entitled to continue the ordinary activities of his day.

[14] The district court found, however, that Mr. Flynn did not have the redemption money in his possession until approximately 2:30 P.M. on June 28, 1988.

[15] Mr. Flynn arrived at Smereka's office/residence at approximately 6:00 P.M. and handed Smereka the envelope with the letter from Brinkman. Mr. Flynn then went to the Korneffels' home and, upon finding no one home, left a copy of the letter in their door.

On the following day, June 29, 1988, the Korneffels obtained a writ of restitution in the 33rd District Court. However, on June 30, 1988, the Flynns filed a complaint in circuit court to enforce their right of redemption.[16] The circuit court issued an order restraining enforcement of the writ of restitution obtained in district court. At a hearing on July 12, 1988, the circuit court judge determined that because the proceedings originated in district court, the Flynns should return to that court to pursue their remedy.[17] The Flynns then motioned the district court to set aside the default judgment. On August 12, 1988, the district court issued a memorandum opinion denying the Flynns' motion to set aside the default.

On February 13, 1989, the circuit court dissolved its preliminary injunction and enforced the writ of restitution previously issued by the court on June 30, 1988.[18] At the request of the circuit court judge, the Flynns filed a motion to enforce the right of redemption in district court on February 16, 1989. Meanwhile, the Flynns appealed the earlier decision of the district court denying their motion to set aside the default judgment to the circuit court. The district court dismissed the Flynns' motion to enforce the right of redemption sua sponte on March 2, 1989, stating that it was without jurisdiction to hear the motion.[19]

---

[16] See n 22.

[17] The temporary restraining order was continued to allow the Flynns to obtain relief in that court.

[18] The circuit court concluded that the Flynns had an adequate remedy in the district court in either a motion for relief from judgment or a restraining order pursuant to MCL 600.8302; MSA 27A.8302.

[19] In a letter addressed to Circuit Court Judge Roland Olzark, District Judge Donald Swank considered the issue to be on appeal to the circuit

Ultimately, on November 8, 1989, the circuit court restrained the Korneffels from enforcing the district court writ of restitution. In response, the Korneffels moved for summary disposition, MCR 2.116(C)(6),[20] in the circuit court. The circuit court entered a dismissal of the action on January 12, 1990.[21]

Plaintiffs filed an application for leave to appeal that decision with the Court of Appeals. In an unpublished per curiam opinion, the Court affirmed the decision of the circuit court, but remanded the matter to the district court for further fact finding. After an evidentiary hearing, the district judge issued an opinion enforcing the writ of restitution.[22]

---

court. He stated that the court did not have further jurisdiction to entertain the motion because the record on appeal had been forwarded to the circuit court on February 16, 1989.

[20] (C) Grounds. The motion may be based on one or more of these grounds, and must specify the grounds on which it is based:

*     *     *

(6) Another action has been initiated between the same parties involving the same claim.

[21] The court dismissed the case, but without prejudice with regard to the district court action.

[22] Plaintiffs contest the validity of the Court of Appeals action remanding the case to the 33rd District Court for an evidentiary hearing. Plaintiffs claim that this was a circuit court action, that the district judge never had jurisdiction over the case, and that the remand to the district court was therefore improper. Plaintiffs' contention is undermined by proper analysis of the procedural history of the case. The summary proceedings *were* properly instituted in district court which had original jurisdiction over the action. MCL 600.5704; MSA 27A.5704. Plaintiffs, however, attempted to enforce their right of redemption by commencing the circuit court action. Plaintiffs improperly term their action a "collateral attack." The writ of restitution had been properly issued by the district court. Therefore, the *only* means by which the circuit court could obtain jurisdiction was by appeal from the district court. MCR 7.101(A)(2). The circuit court action was properly abated. MCR 2.116(C)(6). We conclude that the Court of Appeals properly upheld dismissal of the circuit court action and properly remanded the action to district court.

Subsequently, in its January 5, 1994, order, the Court of Appeals stated that the judgment of forfeiture was properly entered and that the writ of restitution should be enforced against plaintiffs.[23] The Court

---

Thus, the Court of Appeals attained jurisdiction of all issues because it is clear that the same issues were raised in district and circuit courts. We find the Court of Appeals holding persuasive in this regard:

Here, the parties are the same in both the district court and circuit court actions, and both actions arise out of a dispute over whether the parties have satisfied the terms of their land contract. Further, by granting district courts jurisdiction to enforce writs and orders, the summary forfeiture proceedings statute, MCL 600.5732; MSA 27A.5732, evinces a legislative intent that the district court's summary proceedings jurisdiction may continue until the writ of restitution is executed. See also 52A CJS, Landlord & Tenant, § 783, p 195 ("The court issuing the warrant has supervision and control over it until there has been a full and final execution"). Because both the district court and the circuit court possessed concurrent jurisdiction over the enforcement of the writ of restitution, the circuit court action was properly abated. [Unpublished opinion per curiam, issued March 30, 1993 (Docket No. 125687), slip op at 2 (citation omitted).]

We note that plaintiffs' attorney essentially conceded that the same issues were before both courts when he asserted the following at a July 20, 1988, hearing before the district court judge: "I just want a Judge in a fair proceeding to decide whether we made tender."

Furthermore, plaintiffs' allegation that the district judge acted as a master in chancery in violation of Const 1963, art 6, § 5 is without merit. Moreover, plaintiffs' citations to *Karibian v Paletta*, 122 Mich App 353; 332 NW2d 484 (1983), and *Brockman v Brockman*, 113 Mich App 233; 317 NW2d 327 (1982), are irrelevant. The district judge in the present case in no way acted as a master in chancery. The facts of *Brockman* are not on point. The error in *Brockman* was the trial judge's appointment of a retired judge to sit as an acting circuit court judge to make findings of fact and conclusions of law. The Court of Appeals concluded that the acting judge was "without any constitutional or statutory authority to appoint [the former judge] to sit as the court and try this matter." *Id.* at 237. In *Karibian*, the Court did not even reach the issue of a master in chancery. The district judge had jurisdiction on remand and did not act as a master in chancery.

[23] We reject plaintiffs' due process argument based on the Court of Appeals denial of briefing and oral argument. MCR 7.214(E)(1)(c) allows a decision without oral argument where "the appeal is without merit; the panel may enter without oral argument an appropriate order or opinion

held that the writ of restitution extinguished any right of redemption that plaintiffs may have claimed under the land contract. Plaintiffs filed leave to appeal in this Court, which was granted April 5, 1995.[24] We affirm the decision of the Court of Appeals.

II

We must determine whether the writ of restitution is enforceable. The writ is not enforceable if defendants fraudulently prevented plaintiffs from redeeming the property. Alternatively, the writ may not issue if placement of the judgment amount in escrow on the last day of redemption constituted a valid redemption.

A

The equitable right of redemption is governed by MCL 600.5744(6); MSA 27A.5744(6):

> When a judgment for possession is for nonpayment of money due under a tenancy or for nonpayment of moneys required to be paid under or any other material breach of an executory contract for purchase of the premises, the writ of restitution shall not issue if, within the time provided, the amount as stated in the judgment, together with the taxed costs, is paid to the plaintiff and other material breaches of an executory contract for purchase of the premises are cured.

The Legislature has provided vendees in default a ninety-day period to redeem in cases in which less than fifty percent of the purchase price has been

---

dismissing the appeal, affirming, reversing, or vacating the judgment or order appealed from, or remanding the case for additional proceedings."

[24] 448 Mich 908.

paid. MCL 600.5744(3); MSA 27A.5744(3). In order to comply with the statute and exercise this right of redemption, however, it is incumbent on the vendee in default to pay the entire balance *within that period*. This Court must apply the clear language of the statute "[a]bsent some unusual circumstances or additional considerations not within the ambit of the statute . . . ." *Grossman Bldg Co v Elliott*, 382 Mich 596, 603; 171 NW2d 441 (1969). In fact this Court has exercised its equitable power in *unusual circumstances* such as fraud to effectuate a redemption where one has not been executed within the statutory period.[25] *Marble v Butler*, 249 Mich 276; 228 NW 677 (1930). These situations are necessarily limited because fraud requires proof by clear and convincing evidence. *Id.*[26]

Two cases are instructive for purposes of determining what constitutes fraud. First, in *Marble*, the plaintiff and his co-vendees were in default for eleven consecutive monthly land contract payments. The defendant vendor served a notice of forfeiture and almost immediately commenced summary proceedings before a circuit court commissioner to regain possession of the premises.

Before the expiration of the redemption period, the vendor refused to reveal the amount remaining due on the land contract and failed to furnish an abstract of the property in accordance with the contract. Further, the vendee attempted to tender the entire balance due under the contract, and the vendor refused

---

[25] We note that fraud is not the only unusual circumstance warranting exercise of this Court's equitable power.

[26] See *Palmer v Palmer*, 194 Mich 79; 160 NW 404 (1916).

to accept the payment and execute a deed.[27] The redemption amount, together with a copy of the contract and deed to be executed by the vendor, was filed with the clerk of the court.

The Court properly remanded the case "for further action in accordance with this opinion." *Id.* at 280. *Marble* presents an archetypal case of fraud that demonstrates the necessity of this Court's equitable intervention in cases of fraud. In *Marble*, the plaintiff tendered in earnest the full amount due under the contract, *and it was refused.*

*Marble* stands in sharp contrast to the case now before the Court. Here, there was no evidence on remand that a tender was made or refused by Mr. Korneffel or Smereka. In fact, the district court concluded that Smereka did not intentionally make himself unavailable to Mr. Flynn for purposes of redemption.

Similarly, in the second informative case, *Grossman, supra,* the purchasers of a house on land contract defaulted, and the vendor foreclosed. Approximately two weeks before the statutory redemption period was scheduled to expire, the vendees' attorney wrote a letter to the vendor's attorneys requesting the vendor to execute a warranty deed. The vendees stated that they had found a purchaser[28] for the property and that the bank had approved the loan. An attorney for the vendor responded that his client was

---

[27] The plaintiff bought out the interest of his co-vendees, his parents. The plaintiff alleged a conspiracy between one of the co-vendees and the vendor. The Court found that such allegations were supported by the plaintiff's supplemental bill that showed that the vendee tendered the entire balance due under the land contract and it was refused by the vendor.

[28] The vendees were going to redeem the property in order to sell it.

not going to send the deed and that "[a]s far as [they] [we]re concerned, that [was] it." *Id.* at 601.

After the redemption period expired, the vendees filed a motion in circuit court requesting the plaintiff to execute a warranty deed and comply with the terms of the contract. The circuit court ordered the vendor to execute a valid warranty deed to fulfil the terms of the land contract. The Court of Appeals affirmed, and the vendor appealed in this Court.

This Court acknowledged the general rule that the right to redeem is a statutory, legal right that may not be enlarged or abridged by the courts.[29] The Court noted that deviation from that rule is justified only under unusual circumstances such as fraud. Confirming that fraud must be proven by clear and convincing evidence, the Court held:

> Granting defendant [vendee] every presumption of integrity and good faith, the only view we can take of the facts of this case is that the negotiations between the parties' attorneys came to an impasse. However, this situation does not amount to an act of fraud which would justify the intervention of equity. [*Grossman, supra* at 605.]

Consistent with *Grossman*, we uphold the district court's finding that there is no clear and convincing evidence of fraud in the present case. Therefore, we conclude that fraud will not prevent enforcement of

---

[29] The Court quoted *Wood v Button*, 205 Mich 692, 703; 172 NW 422 (1919), which held:

"The right to redeem from a foreclosure at law is a legal right, is created by the statute, and can neither be enlarged nor abridged by courts. A redemption is complete when one having the right to redeem pays in a proper time, to a proper person." [*Grossman, supra* at 603.]

the Korneffels' writ of restitution. Although Mr. Korneffel and Smereka had doubts regarding whether Mr. Flynn had the money to redeem,[30] *both were prepared to accept the redemption money if tendered.* We believe that the present case is one similar to *Grossman,* where the "negotiations between the parties' attorneys came to an impasse." *Id.*

B

Having thus concluded that defendants did not perpetrate fraud, we must otherwise determine whether placement of the funds in escrow constituted a redemption. Plaintiffs analogize to *Birznieks v Cooper,* 405 Mich 319; 275 NW2d 221 (1979). In *Birznieks,* this Court held that the judgment to recover real property was "paid" when mailed on the final day of redemption.

The Court based its decision on the fact that the increasingly customary means of payment between creditor and debtor is by mailing personal checks. In an attempt to effectuate the remedial purpose of the redemption statute, the Court held that the words "within the time provided" and "paid" should be defined in accordance with the understanding of the vendees and tenants. Noting that land contract payments are routinely sent and received through the mail system, the Court reasoned:

> The large number of cases where, because of a course of dealing, personal checks or mailing within the time provided or both have been treated as timely payment demon-

---

[30] In fact, there was testimony and evidence that Mr. Korneffel did not want Mr. Flynn to redeem because the property was worth more than the redemption amount.

strates that there are no intractable problems in treating the
mailing of personal checks as payment. [*Birznieks* at 334.]

The decision merely recognized the means by which
the modern debtor renders payment. The Court con-
cluded that this particular means of payment fully
implements the remedial purpose of the statute.

Plaintiffs maintain that placement of the redemp-
tion money in escrow on the final day of redemption
is actually preferable to the means of payment in
*Birznieks*. We are, therefore, requested to conclude
that plaintiffs "paid" the judgment amount by deposit-
ing it in escrow. We are persuaded, however, that rel-
evant statute and case law require the opposite con-
clusion. In this case, we are constrained by *Kaiser*,
*supra*, holding that an offer to redeem, pending pre-
sentment of a deed is not within the ambit of the stat-
ute or within this Court's equitable power.[31]

In *Kaiser*, the plaintiff's attorney made a similar
arrangement to obtain a loan to redeem forfeited
property purchased on land contract. The plaintiff's
attorney stated that payment would be made when
the vendors delivered a deed to the property. It was
admitted that no legal tender was made to the ven-
dors or their attorney. The Court held that the ven-
dee's willingness to tender payment was not
sufficient:

"We would import into the law an unsafe and litigious ele-
ment if we should hold an offer to perform, with ability to
do so, accomplishes the purpose of a tender, or constitutes

---

[31] We therefore refuse plaintiff's invitation to overrule *Grossman*,
because it properly applies the clear language of the statute.

ground for equitable relief." [*Id.* at 616, citing *Pappas v Harrah*, 221 Mich 460; 191 NW 221 (1922).]

Tender must, therefore, be without qualification or condition.[32] *Id.* Placement of the judgment amount in escrow in the present case amounted only to an offer to close pending fulfillment of the third-party conditions.

Additionally, as distinguished from *Birznieks*, placement of the redemption money in escrow on the final day of redemption without actual notification of the defendants is not a customary means of payment in contemplation of the parties. The conditions could only have been fulfilled if defendants knew about the closing. Details of the closing were *never* communicated directly to defendants. Plaintiffs had one week to communicate their intent to close and make their requests known to defendants. Moreover, plaintiffs had the same opportunity on the morning of June 28, 1988, when Mr. Flynn spoke to both Mr. Korneffel and Smereka. In this regard, we find the district court's opinion on remand instructive:

> Unfortunately, Flynn never explained to Korneffel or Smereka that he was borrowing the funds from a third party and that the third party had turned the money over to Lawyers Title Insurance Company and that the monies could only be disbursed upon the submitting of certain documents to finalize the transaction. It is apparent that Flynn chose to keep the details of his borrowing private from Korneffel and Smereka and did not disclose them to Korneffel or Smereka and chose to unilaterally schedule a closing date with Lawyers Title and then only informed the opposite side of such closing a day prior thereto and only

---

[32] See also *Leonard v Woodruff*, 259 Mich 434; 243 NW 252 (1932).

advised the other side of the time of the closing by leaving a phone message on Smereka's recorder. Smereka did ask Flynn on June 28, 1988 as to whether he was borrowing the money and Flynn would not verify such fact. As a result, Flynn never told either Korneffel or Smereka of the necessity or reason for them to travel a distance to Lawyers Title to receive the redemption money. The court would also find that Korneffel and Smereka were not aware that Flynn was borrowing the redemption money from a third party and they were not aware that the monies were not authorized to be distributed for the purpose of the redemption without a deed and discharges being tendered in a hand-to-hand exchange.

We are, therefore, unable to extend the attenuated principles of *Birznieks* to the present case.

Further, we note that in *Grossman, supra,* it was not incumbent on the vendors to meet the demands of the vendees in default. Instead, it was the responsibility of the vendees to pay the defaulted amount without condition. Pursuant to the facts of this case, the vendors, therefore, had no further obligation than to accept payment upon tender. *Grossman, supra.*

The unilateral act of depositing redemption funds in escrow at the eleventh hour is clearly not within the purview of the statute. Moreover, it is uncontested that both parties knew the mortgages were discharged and that clear title could be passed. In fact, the Korneffels' warranty deed from the Piuntis was recorded and the deed did not show outstanding mortgages.

The dissent would engraft upon the statute an obligation to convey "marketable title" even though plaintiffs had not met their obligations under the statute. Marketable title, as used by the dissent, evidently would obligate the vendors to produce that which

would fulfill the requirements of a third-party lender.[33] Because such a case is not before us, we do not decide the case in which a vendee notifies the vendor in a reasonable manner and within a reasonable time of a third-party lender's conditions on disbursement of redemption funds.

The funds must be paid to the vendor.[34] In the present case, the funds were not paid to the vendor. The Flynns were prohibited from making an unconditional tender by the conditions placed on disbursement of the money by the third-party lender. Even assuming an obligation to comply with the conditions, the vendor must have sufficient notice of the conditions. Certainly, that notification must be directly communicated to the parties. Communication by means of an answering machine on the afternoon of the final day of redemption is not sufficient. The circumstances of this case simply do not appeal to the conscience of the Court. *Grossman, supra* at 603. This result is compelled if we are to remain faithful to the well-established rule that "the right to redeem under present statutes is a legal right and can neither be enlarged nor abridged by the courts." *Id.*

III

Pursuant to the statute and case law cited, plaintiffs could have tendered the money in person or by

---

[33] Notwithstanding the fact that the Flynns were in default and thus "beyond the contract," *Birznieks, supra* at 329, the land contract expressly obligates conveyance of a warranty deed "free from all other encumbrances." It is uncontested that the property was free from encumbrance.

[34] We note that the Court of Appeals in *Karakas v Dost*, 67 Mich App 161; 240 NW2d 743 (1976), held that a vendee may redeem property from foreclosure by payment either to the vendors, the vendors' attorney, or the court.

mail to defendants by the end of the last day of the redemption period. In the present case, neither a reasonable closing date nor a time was ever communicated or agreed upon. Instead, plaintiffs unilaterally scheduled a closing and notified defendants of the closing and their responsibilities at the eleventh hour.

Although the right to redeem is statutory, a court may exercise its discretion in unusual circumstances such as fraud to extend the redemption period. We uphold the findings of the district court and conclude no fraud was perpetrated by defendants. Mr. Flynn did not tender payment within the statutory period, and the district court found that Mr. Korneffel and his attorney did not refuse to make themselves available for payment. Additionally, the placement of the redemption money into escrow under the particular circumstances of this case did not effectuate a redemption because the money was not "paid" to defendants. The decision of the Court of Appeals is affirmed.

BRICKLEY, C.J., and BOYLE and WEAVER, JJ., concurred with RILEY, J.

LEVIN, J. (*dissenting*). The plaintiffs, Wendell C. Flynn and Margaret Ann Flynn, were purchasing a home on land contract. They failed timely to pay amounts due, including a final balloon amount. The seller commenced summary proceedings to forfeit their interest and to obtain possession.

Because the defendants, Curtis G. Korneffel and Maureen A. Korneffel, hoped the Flynns would not be able to redeem within the ninety-day period provided by statute, the Korneffels bought into this lawsuit by purchasing the seller's interest under the land con-

tract, and were substituted as plaintiffs. A judgment
of forfeiture and possession for breach of the land
contract was entered, stating that the Flynns owed
$455,833.35, and that they had until June 28, 1988, to
cure the breach.

Flynn and Smereka, the lawyer designated by the
Korneffels to represent them in further dealings with
the Flynns, spoke on the telephone before 10:00 A.M.
on the morning of the last day, June 28. Flynn advised
Smereka that he would have the redemption money
before the end of the day and that he would need a
deed from the Korneffels pursuant to the land con-
tract conveying the premises to the Flynns and dis-
charges of mortgages from the original seller to a
bank aggregating, in original amount, $505,000—more
than the amount of the judgment.[1]

At one point in the conversation, Smereka said that
he would call Flynn back later in the day. Subse-
quently, Smereka became perturbed and hung up on
Flynn. He did not call back. Smereka and his wife
then left for the rest of the day on a shopping trip.
Before doing so, Smereka advised his client that he
need not remain in his office, and that he too could
leave for the rest of the day.

Smereka did not prepare a deed of conveyance to
be signed by the Korneffels. Nor did he look for the
discharges of the mortgages that he had earlier
obtained after the Korneffels purchased the property
and the vendor's interest in the land contract from the
original seller.

---

[1] The mortgages had been fully paid, but discharges had not been
recorded.

At approximately 2:30 P.M. of the last day, June 28, Lawyers Title Insurance Corporation received a cashier's check for over $550,000 on behalf of the Flynns. Anthony Brinkman, a Lawyers Title officer, and Flynn made a number of telephone calls to Smereka and Korneffel in an effort to set up a closing at Lawyers Title's office in Troy. Neither Smereka nor Korneffel could be reached until after 6:00 P.M.[2]

At that hour, Flynn hand delivered to Smereka at his home/office a letter from Lawyers Title advising that the Flynns had placed in escrow the sum of $466,510.95 to satisfy the judgment, and that they had also left additional monies should there be any discrepancies in the account. The letter stated that Lawyers Title would disburse the funds upon receipt of a warranty deed of the premises from the Korneffels and the discharges of the mortgages from the original seller to the bank.

---

[2] The district court judge found that Brinkman "delayed making any calls to Korneffel or Smereka until after he had the cashier's check in his possession which the court finds to be at approximately 2:30 P.M. on June 28, 1988. Flynn testified that he telephoned Smereka on June 28, 1988, and left a message on Smereka's phone recorder that he had set up the closing for 2:00 P.M and the evidence shows that this is the first time that Flynn actually advised Smereka of the time of the closing . . . . Brinkman testified that he understood the significance of the deadline and further testified that he telephoned Korneffel once but was unable to reach Korneffel by phone and attempted to call Smereka two or three times and left messages on his phone recorder."

The judge referred to Korneffel's testimony "that a call had been received by his staff from Anthony Brinkman at approximately 4:00 P.M. and several calls from Flynn were received by Korneffel's staff but that he never returned the phone calls."

The judge said that Smereka had an answering machine that he listened to after going shopping "to determine that Flynn had attempted to phone him several times while he was shopping with his wife and that Anthony Brinkman [from Lawyers Title] had attempted to call him once while he was away shopping."

On remand from the Court of Appeals,[3] the district court ruled that the summary proceeding statute

- does not require a land contract vendor to "submit deeds and mortgage discharges to the vendee as part of the redemption process," or
- "to cooperate by way of attending a closing or submitting the documents as required by Flynn and as a result, Korneffel and his attorney had no obligation to return phone calls to Flynn in pursuance of Flynn's efforts in this respect."[4]

The Court of Appeals, which had retained jurisdiction, entered an order without opinion, stating that it found no error in the district court's opinion on remand.[5]

---

[3] Unpublished opinion per curiam, issued March 30, 1993 (Docket No. 125687).

[4] The district judge continued in the same vein:

Korneffel and Smereka did have the right to rely on the statute and case law and their failure to return phone calls to Flynn only prevented Flynn from hearing a refusal to attend a closing, but did not otherwise deprive Flynn of his right to redeem the property pursuant to the methods provided by statute and case law.

[5] It appears from papers filed with this Court by the Korneffels after this case was argued, that the Flynns filed an appeal bond for $460,000, which was subsequently increased an additional $100,000.

The Korneffels asserted that real estate taxes amount to over $2,000 per month, and that equitable rent of $118.64 per day has accrued since February, 1988, or $43,303.60 per year, or over $350,000 in equitable rent during the pendency of this litigation.

The Flynns' lawyer asserted that the Korneffels placed a value on the property of well over a million dollars in the proceedings to fix bonds.

It thus appears that as a result of today's decision, the Flynns suffer a forfeiture exceeding $500,000, plus an amount yet to be determined for equitable rent during the eight-plus years this litigation has been pending.

I

The question then is whether a land contract vendor is obliged to deliver to the vendee a warranty deed (and, where there are encumbrances created by the seller, discharges) conveying a marketable title simultaneously with payment by the vendee of the entire unpaid balance required to be paid to redeem from the forfeiture.

I would hold that when the amount required to be paid to redeem from the forfeiture is not a periodic installment, but represents the entire unpaid balance of principal and interest, the vendor is obliged to deliver to the vendee—*simultaneously* in exchange for receipt of the amount required to fully pay the contract and to redeem from the forfeiture—a warranty deed conveying to the vendee a marketable title of the premises and discharges of any encumbrances created by the seller.[6]

---

[6] There is no need to consider in the instant case whether a vendor should be notified by the vendee in advance, or for how long in advance or by what means, that the vendee requires simultaneous exchange of payment in full and the deed and discharges.

Korneffel was notified by Flynn on April 8, and again on June 27, that he intended to redeem. When Flynn spoke with Smereka on the morning of June 28, he said that he would need the deed and the discharges. Smereka expressed surprise that the discharges had not been recorded, although he acknowledged that it was his responsibility to do so. See n 16.

Korneffel had obtained the discharges when he purchased the vendor's interest from the original seller. Between the morning and afternoon of June 28, there was ample time for Smereka to find the discharges, and ample time for Smereka to prepare a warranty deed to be signed by Korneffel and his wife.

A copy of the deed of conveyance from the original seller to the Korneffels is part of the record. All that Smereka needed to do was to copy the very same deed, substituting the Korneffels as grantors and the Flynns as grantees. Preparation of the deed would not have delayed Smereka more than a few minutes in embarking on his "previously arranged shopping trip with his wife." *Ante,* p 193.

I would so hold because

● The land contract so expressly provides, stating:

> The seller agrees as follows:
>
> *       *       *
>
> (c) *Upon receiving payment in full* of all sums owing herein, less the amount then due on any existing mortgage or mortgages, and the surrender of the duplicate of this contract, *to execute and deliver to the Purchaser* or the Purchaser's assigns, *a good and sufficient Warranty Deed conveying title* to said land, subject to aforesaid restrictions and easements and subject to any then existing mortgage or mortgages, and *free from all other encumbrances*, except such as may be herein set forth, and except such encumbrances as shall have accrued or attached since the date hereof through the acts or omissions of persons other than the Seller or his assigns. [Emphasis added.]

● The land contract remains in full force and effect unless the forfeiture becomes absolute.[7] A vendor is therefore, as with contracts generally, under a "duty of good faith and

---

[7] My response to the majority's assertion that because "the Flynns were in default and thus 'beyond the contract,' " *ante*, p 206, n 33, is set forth in n 14.

After a default in payment of a periodic installment, the vendor has the option of commencing either summary proceedings, or an action to foreclose "in equity."

This land contract contained the standard provision that if the default continued for a period of forty-five days or more, and the vendor desired to foreclose the contract "in equity," he could declare the entire unpaid balance due and payable. If the Korneffels had foreclosed in equity, there would have been no forfeiture of the vendee's interest in the land contract, and the contract would have remained in full force and effect until the period of redemption from a foreclosure had expired.

fair dealing in its performance and its enforcement."[8] This requires the vendor— when notified, as the Korneffels were not later than the morning of the last day, June 28, that the vendee requires simultaneous exchange of the deed and discharges for the money[9]—to deliver the deed and discharges simultaneously in exchange for receipt of the money.[10]

---

Although a forfeiture is declared by a vendor before and upon commencing summary proceedings, the forfeiture does not become absolute unless the vendee fails to redeem. Thus, if the vendee fails to pay installments and a judgment of forfeiture and for possession is entered, and the vendee timely redeems, the forfeiture does not become absolute, the vendee is entitled to remain in possession, and the land contract remains in full force and effect.

Similarly, in the instant case, where the default was not respecting a periodic installment, but, rather, the entire unpaid balance that had become due, unless the forfeiture became absolute because the Flynns failed timely to redeem, the land contract remained in full force and effect.

[8] *Every* contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. [2 Restatement Contracts, 2d, § 205, p 99 (emphasis added).]

This Court observed that "the vendor under a land contract holds the legal title as trustee for the vendee and trust relations are an element of the contract." *Curry v Curry*, 213 Mich 309, 315; 182 NW 98 (1921).

[9] See n 6.

[10] The majority asserts (*ante*, p 191, n 5) that, in relying on the "duty of good faith and fair dealing" in the performance and enforcement of a contract, n 8 *supra*, I make my own "findings of fact." The majority further asserts that this dissent is based "in substantial part" on such "purport[ed]" findings that the Korneffels did not discharge their contractual duty to perform in good faith and to deal fairly. The majority also states that my "own findings of fact" are "belied" by the district court's finding that neither Korneffel nor his lawyer "exhibited bad faith."

This dissent does not depend on whether the Korneffels and Smereka acted in good faith and dealt fairly with the Flynns. Even if there were no doctrine of good faith and fair dealing, the Korneffels nevertheless were contractually obliged to simultaneously exchange a warranty deed and mortgage discharges "upon" payment of the amount owing. They refused to do so, insisting on the erroneous view, advanced by their lawyer (Smer-

II

The summary proceeding statute does not, indeed, provide that a land contract vendor, upon payment in full of the balance owing (the amount required in this case to redeem), has an obligation to convey marketable title.[11] Nevertheless, everyone—Smereka, the Korneffels and, I expect, the majority also—recognizes that, the silence of the statute notwithstanding, had the Flynns paid the entire unpaid balance (the redemption amount) by June 28 and *not* demanded a deed of conveyance and the discharges at that time, the Korneffels would have been obliged, in due course, to convey a marketable title and to furnish the discharges.[12]

---

eka), the district court judge, and now by the majority, that they were not under a legal obligation to do so.

One need not go so far as to say that the Korneffels were guilty of bad faith. Assuming arguendo that they were not, it would not follow that their conduct and that of their lawyer, Smereka, could properly be described as conduct commensurate with the obligation of good faith and fair dealing. Smereka testified that he would not walk across the street to accept the redemption money, and advised Korneffel that he did not have to be available on June 28 because his sole obligation was to accept the check (which his staff could do) if it was tendered.

I would be hard-pressed to make an argument in support of the district court finding that the Korneffels' and Smereka's conduct did not evidence bad faith. It is almost impossible to argue that their conduct exemplified good faith and fair dealing. In all events, they were obliged—good faith/bad faith/no faith—to exchange a warranty deed and mortgage discharges upon receipt of the redemption money.

[11] Contrary to the majority's assertion (*ante*, p 205), I would not "engraft upon the statute an obligation to convey 'marketable title.' " The statute does not address the title to be conveyed upon payment, and a vendee may, knowingly or unwittingly, agree to purchase a title that, in the minds of some, is unmarketable. For example, some land contracts may call for a quitclaim deed or a deed with covenants only respecting the vendor's own acts. Thus, the obligations of the vendor and vendee respecting the title to be conveyed depend on the contract between them, not the summary proceedings statute.

[12] The majority does not acknowledge or discuss the Korneffels' obligation under the land contract to deliver, upon payment in full, a marketable

We thus, I think, would all agree that the failure of the statute to expressly advert to the vendor's contractual obligation to convey a marketable title upon receipt of full payment did not relieve the Korneffels of their contractual obligation to convey a marketable title in due course.[13]

---

title, or a good and sufficient warranty deed conveying marketable title to the property free of all encumbrances except those created by persons other than the original seller or the Korneffels.

The majority adverts to the mortgages undischarged of record, but stresses that a warranty deed from the original seller to the Korneffels had been recorded "which evidenced that the mortgages had been discharged," *ante*, p 192, n 7, and that the "warranty deed from the [original seller] was recorded and the deed did not show outstanding mortgages." *Ante*, p 205. No lawyer would rely on that as evidence of marketable title. A lender or purchaser would require that the mortgages be discharged of *record*. As one treatise writer said:

> [T]he mortgagor may have been restored to his former ownership of the property with the mortgage lien discharged so far as substantive legal interest in the property is concerned. *However, the mortgage may still be of record and, until it is discharged of record, the mortgagor's former position in respect to his title to the land is not completely reestablished.* [Osborne, Mortgages (2d ed), § 302, pp 624-625.]

While I agree that it is "uncontested that the property was free from encumbrance" (*ante*, p 206, n 33), the failure to discharge the mortgages of record meant that no one other than the bank, from whom the money was borrowed, and those who had seen the discharges delivered to Smereka by the bank, could be sure that this was so. For the rest of the world, the records in the office of the Register of Deeds showed that the mortgages were still an encumbrance on the property, and, therefore, "title [was not] completely reestablished."

[13] I do not contend, as the majority claims, that the obligation of the vendors to provide clear title obligates the vendors to "fulfill the requirements of a third-party lender." *Ante*, p 206. The vendor's obligation under the land contract was to convey a marketable title, not to satisfy a lender. What constitutes a marketable title is a factual matter that depends on the judgment and opinions of persons qualified to express such an opinion. Generally, today, reliance is placed on the judgments and opinions of the title insurer. Obviously, its judgment and opinion are subject to review—the vendors are not obliged to produce anything that a third-party lender might require. In the instant case, however, the third-party lender required only delivery of a deed and the discharges. Indisputably, what it required

It is, thus, false to assert that, because the summary proceeding statute does not expressly set forth that the vendor continues to be obligated during the redemption period to convey a marketable title upon (or following) receipt of full payment, the scope of the vendor's obligations during the redemption period is narrowed.[14]

---

was absolutely necessary to evidence the marketable title required by the contract.

[14] The majority states that because the Flynns "were in default," they were "*thus* 'beyond the contract,'" *Birznieks* [*v Cooper*, 405 Mich 319, 329; 275 NW2d 221 (1979).]" (Emphasis added.) The words "beyond the contract" appear in the following paragraph:

> A judgment for possession is, under the statute, subject to the redemption rights of the vendee or tenant. No agreement between the parties can deprive a vendee or tenant of his right to cure the default. The parties are *beyond the contract*. The vendee or tenant now exercises a statutory right, a right which can be diminished neither by the express nor the implied terms of the contract. [*Id.* at 329-330 (emphasis added).]

The majority, in so intimating that the silence of the statute, as distinguished from the language of the contract, governs whether there is any vendor obligation of simultaneous exchange of money and deed/discharges, errs in hinting or suggesting that, because the Flynns were in default, the contract did not govern whether there is a vendor obligation of simultaneous exchange.

In stating that when the vendee is in default and the time for redemption is running, the parties are "beyond the contract," *Birznieks*, as the context expressly states, was saying only that the vendee's statutory rights .of redemption cannot be *diminished* by the terms of the contract. *Birznieks* did not state that the parties' obligations, one to the other, to the extent not governed by the statute, do not remain in full force and effect while the time for redemption is running, although the vendee is in default.

In all events, all the vendee's rights under the land contract would be reinstated instantly upon redemption, i.e., upon payment of the redemption money to the vendor. The moment the money is paid, all the obligations of the parties under the land contract would become fully enforceable, even *if* they were dormant during the period of default and while the time for redemption was running. Thus, this argument begs the question what were the vendor's obligations upon payment of the redemption money.

The majority's construction of the summary pro-
ceedings statute rests on the misperception that the
statute provides a begrudged period of leniency for
vendees in default, and that the statute allows ven-
dors to do nothing during the redemption period
beyond accepting a check.

This Court observed:

> Sellers no longer are at liberty immediately after forfei-
> ture of a land contract to seize possession of premises and
> put purchasers out on the street. Forfeiture can be effected
> only upon observance of procedures which provide land
> contract purchasers with protections similar to, in many
> cases equal to or better than, those provided mortgagors.
> [*Gruskin v Fisher*, 405 Mich 51, 58; 273 NW2d 893 (1979).]

As this passage indicates, while the summary pro-
ceedings statute provides a procedure to enforce the
vendor's rights, it also provides protection for vend-
ees. The majority's construction is strained, and is
contrary to the legislative intent[15] to codify the law's

---

In the instant case, the only obligation on the part of the vendor that
remained to be discharged was the obligation to convey the property
"upon" payment of the redemption money. Clearly, there is no time lapse
between payment of the redemption money and restoration of all the ven-
dee's rights and obligations and all the vendor's rights and obligations
under the land contract.

[15] MCL 600.5744(6); MSA 27A.5744(6), provides:

> When the judgment for possession is for . . . nonpayment of
> moneys required to be paid under . . . an executory contract for
> purchase of the premises, the writ of restitution shall not issue if,
> within the time provided, the amount as stated in the judgment,
> together with the taxed costs, *is paid to the plaintiff* . . . .

It is this Court's responsibility to construe this language consistent with
the legislative intent and common-law principles. The tender rule adopted
by the majority ignores these concerns.

abhorrence of forfeitures into a straightforward procedural system.

The statute creates a *legal* right in vendors to initiate forfeiture proceedings and a *legal* right in vendees to redeem after judgment. Contrary to the majority's assertion, the right is no longer "equitable." *Ante*, p 198. The "reasonableness" of the vendee's actions is not determinative if he has complied with the terms of the statute. As the majority notes, "the right to redeem is a statutory, legal right that may not be enlarged or abridged by the courts." *Ante*, p 201.

Although acknowledging this principle, the majority abridges the rights of a vendee to redeem pursuant to the land contract by refashioning the tender rule into an absolute reprieve of any obligation on the part of the vendor to participate in the redemption except for having someone available to accept an unconditional payment—documentation to follow when the vendor decides it is convenient to fulfill his obligations under the contract.

III

There is no need to consider whether the land contract and the accompanying duty of good faith and fair dealing obliged the Korneffels or their lawyer, Smereka, to attend a closing at the Lawyers Title office—to travel from Grosse Ile (where the Korneffels reside) or Northville (where Smereka had his home/office) to Troy, where Lawyers Title office was located, to receive a Lawyers Title check for $466,510.95.

Nor was it of any significance that Flynn obtained the money and offered to redeem at the eleventh hour, or whether Smereka made himself unavailable

by leaving, after hanging up on Flynn on the morning of June 28, on the assertedly long-planned shopping trip with his wife.

Smereka, aware of Korneffel's desire to thwart redemption, maintained (and the district court subsequently agreed) that the Korneffels had no obligation to facilitate the redemption by exchanging the deed and discharges upon receipt of the money. Smereka maintained that it was the Flynns' obligation to pay the $466,510.95 to redeem without simultaneous delivery of a deed or discharges of encumbrances, and that the Korneffels could, thus, at their convenience— possibly their leisure—provide the requisite deed and discharges at some indefinite time after receipt of the redemption money.

After speaking to Flynn on the morning of June 28, Smereka did not prepare the discharges for recording or seek to have them available[16] so that he would have them in hand to deliver to the Flynns should they offer to redeem. Nor did Smereka prepare a deed of conveyance to be signed by the Korneffels, and request that the deed be signed and returned to him so that he would have a deed should the Flynns offer to redeem. Smereka told Korneffel that he too could take the rest of the day off and need not remain in his office. He too could be unavailable.[17]

In Smereka's and the district court's analysis, this obstructionism would have been legally justified even

---

[16] Smereka testified that he had obtained the discharges of mortgages from the bank that had been the mortgagee. He acknowledged that he had not recorded the discharges, although it was his responsibility to do so.

[17] Korneffel left for the balance of the day, purportedly advising persons in his office that, if the Flynns should come by with a check, they should accept it.

if Flynn had earlier deposited the money with Lawyers Title (e.g., on the tenth or the seventy-fifth day) and had offered to redeem in exchange for delivery of the deed and discharges, or even if Smereka had remained in his office throughout the last day, June 28, and had not gone on the long-planned shopping trip, and even if Lawyers Title had tendered a check at Smereka's office in Northville.

Because Smereka maintained that he had no obligation on June 28 to have ready the mortgage discharges, and no obligation to prepare and have in hand a signed deed of conveyance from the Korneffels, even if Smereka had remained in his office all day and the Lawyers Title check had been presented in his office, he would have been unable to deliver, and asserted he had no obligation simultaneously then to deliver, a deed and the discharges.

The true and only issue in this case is thus simply whether the Korneffels were obliged simultaneously to exchange deed and discharges for the money.

If, as the district court ruled, a vendor has no obligation to cooperate during the ninety-day redemption period, by simultaneously furnishing a deed and discharges of any vendor-created encumbrances in exchange for the money, and thereby facilitate new financing, or a sale to a purchaser, then the law permits the vendor to frustrate new financing or a sale needed to redeem, whether on the tenth or seventy-fifth day or at the eleventh hour on the last day.

IV

But the law is not so foolish. The case law does not negate the obligation of the vendor to provide the deed and requisite discharges simultaneously in

exchange for payment in full of the contract balance and redemption amount.

The majority states that "in order to effectuate the right of redemption, the full amount, not merely an offer, must be tendered *without qualification or condition. Kaiser v Weber*, 301 Mich 609; 4 NW2d 29 (1942)."[18] (Emphasis added.)

The statement that a tender must be "without qualification or condition" is an accurate generalization, but does not fully state the law, which recognizes that a debtor making tender may interpose conditions that have a "foundation in the contractual relation," and that there are certain conditions that a "debtor has the right to insist on" as "when the performance of an act on the part of the creditor is to be precedent to or *concurrent* with the payment by the debtor."[19] (Emphasis added.)

---

[18] *Ante*, p 189. In *Kaiser*, this Court quoted the trial court's findings " 'that there were no competent proofs that the defendants herein or their agents or attorneys interfered with or prevented plaintiff or anyone in her behalf *from securing a loan with which to pay the moneys due* . . . .' " 301 Mich 612-613. (Emphasis added.)

In the instant case, Smereka and the Korneffels prevented the Flynns from obtaining disbursement of the loan proceeds of over $500,000 from the Lawyers Title escrow to the Korneffels by refusing to provide a deed and the discharges simultaneously in exchange for the redemption money.

[19] It is the universal rule that a tender upon condition for which there is *no foundation in the contractual relation* between the parties is ineffective, or as sometimes expressed, a tender must be without conditions to which the creditor can have a valid objection or which will be prejudicial to his rights. Thus, *where there is nothing in the contractual relation* between the parties to warrant it, an offer of the amount due on condition that a judgment shall be assigned renders the tender ineffectual as such. A tender of money which is not, at the time being, the debtors to tender, the property therein being in another, is conditional, and ineffectual and constitute a tender. *But where the condition is one which the debtor has the right to insist on*, a tender made subject to that condition is valid. Thus, *when the performance of an act on the part of the creditor is to be precedent to or concurrent with the payment by*

A number of courts have ruled that a "tender is not conditional . . . if the condition is one which the person making the tender has a legal right to insist upon."[20]

The stipulation, in the letter delivered on June 28 from Lawyers Title to Smereka, that the Korneffels furnish a deed of conveyance and discharges of the mortgages had a "foundation in the contractual relation"; the land contract obliged the Korneffels "upon"

---

*the debtor, the latter may make his offer depend on the due performance of that condition.* In some jurisdictions provisions to this effect are found in the statutes. [74 Am Jur 2d, Tender, § 24, pp 561-562 (emphasis added).]

[20] The Arizona Court of Appeals said:

The wife urges that the tender was indeed conditional because it was accompanied by a demand for a quitclaim deed and because, had she accepted the $28,000 and signed a quitclaim deed, she would have had to vacate the residence. We reject her argument and reverse the ruling of the trial court.

A tender, to stop the running of interest on a judgment, must be unconditional. [Citations omitted.] *A tender is not conditional, however, if the condition is one which the person making the tender has a legal right to insist upon. Plank v Arban,* 241 So 2d 198 (Fla App, 1970); *Jefferson Trust & Savings Bank v W Heller & Son,* 296 Ill App 447; 16 NE2d 433 (1938); *Jacoby v Rosebrock,* 117 Ind App 435; 70 NE2d 766 (1947); *Woods v Dixon,* 193 Or 681; 240 P2d 520 (1952); *Ruscon Construction Co v Beaufor[t]-Jasper Water Authority,* 259 SC 314; 191 SE2d 715 (1972). The requirement that the wife execute the deed and vacate the premises was part and parcel of the court's decree. *It was not some condition tacked on by the husband to gain some advantage or thing of value which he did not already have a right to by virtue of the court's existing order.* The tender was simply not conditional. [*In re Marriage of Dull v Dull,* 138 Ariz 357, 359; 674 P2d 911 (Ariz App, 1983) (emphasis added).]

The Arizona court's opinion explains why conditions on which a party has a right to insist should not nullify tender. The general rule developed to prevent a party from extracting concessions from the other party. Where, as here, the "condition" is only what the vendee has "a right to by virtue of the" contract, the tender is "simply not conditional."

receipt of full payment to convey a marketable title. Those stipulations regarding the furnishing of a deed and discharges were ones "which the debtor ha[d] the right to insist on." The timely furnishing of the deeds and discharges was "the performance of an act on the part of the creditor" that was to be "concurrent with the payment by the debtor," and thus the Flynns could make their offer depend on the due performance by the Korneffels of those obligations under the contract.[21]

In *Kaiser*, five years after the vendor had reobtained possession of the premises in the course of land contract forfeiture proceedings during the Great Depression, the plaintiffs sought to reopen the matter by an action in chancery. They claimed that their lawyer had made an arrangement to obtain a loan to redeem the property. The lawyer testified that he advised the vendor that the payment would be made when the vendors delivered the deed. But no formal written tender was made to the vendors or their attorneys. This Court ruled that it would introduce an "unsafe and litigious element" if this Court were to hold that "an offer to perform, with ability to do so," was a sufficient tender. *Id.*, p 616.

---

[21] In *Marble v Butler*, 249 Mich 276, 279; 228 NW 677 (1930), the vendee deposited the amount due the vendor, "together with a copy of the contract, the assignment from his parents of their interest in the contract, *and a deed to be executed by [the vendor]*, with the clerk of the court." The vendor had made it clear he would not accept tender and otherwise tried to frustrate redemption. The Court ruled that the vendee's actions were an adequate substitute tender although the vendee had also submitted to the court a deed for the vendor to sign, in exchange for the redemption money.

In the instant case, the Flynns could not deposit the money in court with a deed to be signed by the Korneffels because Lawyers Title was not authorized to release the money from escrow until it received a deed and the discharges.

The majority states that Korneffel and Smereka "were prepared to accept the redemption money if tendered. We believe that the present case is one similar to *Grossman* [*Bldg Co v Elliott*, 382 Mich 596; 171 NW2d 441 (1969)], where the 'negotiations between the parties' attorneys came to an impasse.' "[22]

In *Grossman*, the vendor declined to forward a deed to a bank where the vendee may have arranged a new loan. In the instant case, Smereka took obstructionism one step further in taking the position that Korneffel was not obliged to provide a deed and the discharges simultaneously in exchange for the money.

In contrast with the instant case, the vendee in *Grossman* did not deposit the money with a recognized escrow agent, and did not make a formal tender together with a demand for the deed. The vendee's response in *Grossman* was to do nothing; it was not until after the time for redemption had expired that he commenced proceedings.

*Grossman* stands for the proposition that an anticipatory breach by the vendor—the refusal to forward a deed to a lender—did not relieve the vendee of the obligation to make a formal tender, and to show that it had the money to back up the tender. *Grossman* does not stand for the proposition that if the vendee makes a formal tender with irrefutable evidence that the money is there, the vendor has no obligation to simultaneously provide a deed conveying a marketable title in exchange for the money.

In *Kaiser* and *Grossman* there were only promises to pay from vendees who had already failed to keep

---

[22] *Ante*, p 202.

their promises of payment, resulting in an action to foreclose in *Grossman* and an action to forfeit in *Kaiser*. Placing money in escrow with a recognized escrow agent is not just another promise. Placing money in escrow is concrete evidence of ability to perform. It does not introduce an "unsafe and litigious" inquiry regarding the ability to perform pursuant to the terms of the tender. Placing the money in escrow with a title company, with notice to the vendor that it will be released to him upon performance of his obligations under the land contract, is tender.

V

The majority at no point adverts to the vendor's responsibility to provide, "upon" receipt of payment in full, a warranty deed conveying a marketable title.

The majority affirms the trial court's decision that Korneffel was entitled to require payment of the redemption money without simultaneously delivering in exchange a deed of conveyance and the mortgage discharges.

The majority asserts that it does not decide the case of a vendee who notifies the vendor in a reasonable manner and within reasonable time of a third-party lender's conditions on disbursement of redemption funds. But the majority is deciding that case also if its opinion is read as accepting Smereka's and the district court's analysis that there is no obligation to furnish a deed and discharges simultaneously ·in exchange for the money. Deposit of the redemption money with the district court would not have provided the requisite deed and discharges needed to authorize Lawyers Title to release the money.

If the law does not require simultaneous exchange of money and deed and discharges during the redemption period, no court could lawfully require simultaneous exchange even if the money had been on deposit with an escrow agent for over a month, and a month still remained in the redemption period.

If the majority truly is not deciding this issue, it is introducing an "unsafe and litigious element" into land contract law by requiring that cases be brought to define what is "a reasonable manner" of notification and what constitutes "a reasonable time."

There is no need to decide what is "reasonable" because the Legislature has already done so. The statute provides that vendees who have not yet paid fifty percent of the principal owing under the contract have ninety days to redeem. While ideally notifications and redemption will be done earlier, a party may need the full ninety days to find a lender or purchaser. If this does not happen until "the eleventh hour," *ante*, p 207, the statute does not authorize a court to ignore the vendee's efforts because he uses a full twelve hours.

If "reasonableness" is judicially written into the statute, the majority abridges the legal right to redeem under the statute as written by shortening the time to acquire financing from ninety days, to a "reasonable" period before ninety days that a particular judge believes to be appropriate.

"Ninety days" is not subject to judicial interpretation. This Court should apply the statute as written.

Either both the vendor and vendee must cut square corners, or only the vendee is required to do so. All else—whether Smereka purposefully made himself unavailable, whether Smereka was obliged to cross

the street or travel to Troy to obtain the redemption money, or whether the Flynns should have acted before the eleventh hour—is a sideshow.

Either the vendee may require, to facilitate refinancing or a sale, that the deed and discharges be delivered simultaneously with payment in full, or the vendor has a right to insist on payment in full before bothering to assemble discharges and prepare and sign a deed conveying a marketable title.

VI

I acknowledge that the statute does not address the question whether the vendor is required to deliver a deed of conveyance and discharges of any encumbrances created by the vendor simultaneously in exchange for payment of the redemption money. That is left to the contract between the parties.

I also acknowledge that the land contract does not in so many words address the question whether a simultaneous exchange is required. I contend however, that the contract *contemplates* a simultaneous exchange.

I would hold that the contractual obligation to convey "upon receiving payment in full" obligates the vendor to provide a simultaneous exchange of marketable title sufficient to meet the demands of a reasonable title insurer, which, ordinarily, almost always, will be neither more nor less than what the vendee's third-party lender would require.

*The Random House Dictionary of the English Language, Second Edition Unabridged,* defines "upon" as meaning "immediately or very soon after." It is not a stretch of the English language to define "upon" as meaning "immediately."

This Court has the power, of course, to rule that "upon" means "very soon after," with the result that a land contract vendor can stonewall the vendee, as the Korneffels did on the advice of Smereka.

Whether one definition or another is to be adopted is the issue posed by this appeal. This Court has a choice. It can define "upon" in a way that makes it impossible for a land contract vendee in default to refinance or sell the property—because if the vendor does not have an obligation to convey and furnish discharges of mortgages until "very soon after," that will never be soon enough for a lender or a purchaser.

Or the Court can, as I think it should, define "upon" as meaning "immediately," to facilitate refinancing or sale.

There is only one construction that is consistent with the history and spirit of the summary proceeding statute, the contractual obligation of good faith and fair dealing, and the expectations of the profession generally.[23] Practitioners, I am confident, would expect this Court to adopt the view that the vendor is obliged, simultaneously upon receipt of the redemption money, to furnish, in these circumstances, a deed and any discharges necessary to clear the title.

Most lawyers, I believe, would also agree that the obligation of good faith and fair dealing would oblige a vendor to cross the street[24] to obtain the redemption money, possibly even to travel from Northville or Grosse Ile to Troy to obtain the redemption money at a closing, and certainly to have ready the documents

---

[23] Excepting the self-serving view of Smereka, who knew that his clients, the Korneffels, hoped that the Flynns would not redeem.

[24] See n 10.

necessary to complete the contract once the redemption money is available.

VII

In sum, the land contract expressly obliged the Korneffels to deliver to the Flynns a warranty deed of conveyance free from all encumbrances[25] "*upon* payment in full of all sums owing on the land contract." Absent delivery of such a deed and discharges of the mortgages aggregating $505,000 in original amount, the Flynns would not have a marketable title justifying disbursement by Lawyers Title of $466,510.95.

The Flynns needed and were justified in requiring simultaneous delivery of the deed and discharges; the land contract expressly provided that "*upon* full payment" the seller would convey a marketable title. This, coupled with the obligation implicit in contracts generally of good faith and fair dealing, obliged the Korneffels minimally to have available in Smereka's office in Northville such a deed and those discharges to be exchanged for a Lawyers Title check for $466,510.95 at Smereka's convenience at some time designated by him in response to the many telephone calls from Lawyers Title beginning at 2:30 P.M. on June 28.

The money was there. It was on deposit with Lawyers Title, nationally recognized as an escrow agent, to facilitate the exchange of money and documents affecting real estate.

The case law relied on by the Korneffels does not hold that a land contract vendee may not insist on

---

[25] Except encumbrances not created by the original seller or the Korneffels.

simultaneous exchange of payment in full and of documents of conveyance and discharge needed to vest a marketable title in the vendee. Rather, the law is to the contrary: a vendee may insist on performance of an act by the vendor that is to be concurrent with payment in full by the vendee.

The tender by Lawyers Title in behalf of the Flynns imposed no stipulation other than performance by the Korneffels of their contractual obligations to convey a marketable title "upon" receipt of full payment, a stipulation that the Flynns were legally entitled to impose. Because the stipulation concerned only the Korneffels' express obligations under the contract, the tender was sufficient to redeem. Because the tender was sufficient, and timely, the Flynns did not have the burden of establishing fraud.

The decision of the Court of Appeals should be reversed.

Cavanagh and Mallett, JJ., concurred with Levin, J.

Cavanagh, J. (*dissenting*). The issue in this case is whether an installment land contract vendor has any duty to cooperate with the vendee's attempts to redeem the property from forfeiture. The majority holds that a vendor has *no* obligation beyond accepting unconditional tender. In the factual setting presented in the instant case, I would find a limited duty on the part of the vendor to cooperate with a vendee's attempts to redeem when the vendee is ready, willing, and able to effectuate redemption but for commercially reasonable conditions imposed by a third-party lender, and the said conditions attached to the tender are a result of the vendor's use of the property after executing the land contract. This duty

would comport with the customary means of finalizing a transfer of real property, which is a closing where the funds are simultaneously exchanged for the necessary title documents.

I believe that there are two primary reasons for imposing on such a vendor a duty to cooperate with the vendee in a closing. First, when the sale of land is accomplished through the use of an installment land contract that provides for a balloon payment arrangement, it is not an unreasonable expectation that the vendee will not be able to make the balloon payment absent another loan arrangement. Accordingly, a vendor should be on notice that a commercial lender will not loan an amount of funds sufficient to cover a balloon payment without proof of clear title. Second, and more importantly, when the vendor seeking forfeiture, or his predecessor, has created a postexecution cloud on the title that prevents the vendee from obtaining an unconditional loan to cover the default judgment, it would be manifestly unfair to allow the vendor to sit back, refuse to cooperate with the vendee's redemption attempts, and then reap the rewards of forfeiture by recovering the property in its improved condition as well as by keeping the payments already made.

I

The relevant statutory right of redemption provides:

> When the judgment for possession is for nonpayment of money due under a tenancy or for nonpayment of moneys required to be paid under or any other material breach of an executory contract for purchase of the premises, the writ of restitution shall not issue if, *within the time provided*, the amount as stated in the judgment, together with the taxed costs, is *paid* to the plaintiff and other material

breaches of an executory contract for purchase of the premises are cured. [MCL 600.5744(6); MSA 27A.5744(6) (emphasis added).]

In *Birznieks v Cooper*, 405 Mich 319, 334; 275 NW2d 221 (1979), this Court considered the modern means by which a debtor renders payments on a land contract: "sending personal checks through the mails." The Court then concluded that "paid" would be satisfied if the vendee mailed to the vendor (or his lawyer) a personal check for the full amount "within the time provided." *Id.* at 335. Likewise, in determining whether the statute requires the vendor to "do" anything beyond waiting for the check, we should not ignore that in-person closings are the customary modern means by which transfers are accomplished. We should also consider the financial dynamics of the particular sale method chosen.

First, we must keep in mind the financial reasons why land contracts are used. In general, a seller finds many advantages in selling real property by an installment land contract rather than by a mortgage.[1] For instance, unlike a mortgagee, during the life of the installment land contract the vendor may often use the property as collateral for other loans, as was expressly provided for in the instant contract.[2] Unlike a mortgagee, the vendor also has the additional rem-

---

[1] See 7 Powell, Real Property, ¶ 938.20[2], pp 84D-5 to 84D-6.

[2] The land contract provided:

The Seller and Purchaser mutually agree as follows:

(a) That the Seller may, at any time during the continuance of this contract encumber said land by mortgage or mortgages to secure not more than the unpaid balance of this contract at the time such mortgage or mortgages are executed. Such mortgage or mortgages . . . shall be a first lien upon the land superior to the rights of the Purchaser herein; provided notice of the execution of

edy of forfeiture[3] by which the vendor can recover the property, retain all payments made under the contract, and avoid a court-ordered sale of the property in a foreclosure.[4] If the property's value is substantially greater than the forfeiture judgment, the vendor will receive a windfall. In contrast, a mortgagee must pay any excess to the mortgagor.[5] Forfeiture is usually a quicker remedy to pursue than foreclosure,[6] and is also accompanied by the statutory provision that abolishes any equitable right of redemption.[7]

For these reasons, a purchaser generally would prefer acquiring land by a mortgage.[8] However, installment land contracts are a viable alternative method of acquiring property for purchasers who do not have the means to secure a substantial down payment required by mortgage lenders, or in times when interest rates for mortgages are higher than the statutorily limited rate for installment land contracts.[9] In times

---

said mortgage or mortgages . . . shall be sent to the Purchaser by registered mail promptly after execution thereof.

[3] MCL 600.5744; MSA 27A.5744.

[4] The instant land contract provided that on default by the vendee

the Seller immediately after such default shall have the right to declare the same forfeited and void, and retain whatever may have been paid hereon, and all improvements that may have been made upon the premises, together with additions and accretions thereto, and consider and treat the Purchaser as his tenant holding over without permission and may take immediate possession of the premises . . . .

[5] MCL 600.3135; MSA 27A.3135.

[6] MCL 600.3115; MSA 27A.3115 (foreclosure sale).

[7] Section 5744(7).

[8] See 1 Deems & Tervo, Michigan Real Estate Practice & Forms (2d ed), § 6.6, p 6-6.

[9] The interest rate for land contracts is generally limited by statute to eleven percent. MCL 438.31c(6); MSA 19.15(1c)(6).

of high interest rates, a frequently used payment plan involves monthly payments over a short period of years, with a large balloon payment at the end of the life of the contract.[10] This financial arrangement is beneficial to sellers because it increases the pool of potential purchasers. In addition, vendors should know that purchasers may agree to the balloon payment arrangement with the expectation that financial conditions will have improved by the time that the balloon payment would be due, perhaps because their own personal financial situation will have improved to the extent that a mortgage lender would be more willing to loan the funds to cover the balloon payment, or because interest rates will fall, making mortgages a more affordable alternative. Whether these above expectations ever become reality does not change the fact that any installment land contract vendor who agrees to a balloon payment plan should reasonably expect that more often than not the vendee will only be able to secure the funds to cover the balloon payment through another financial loan arrangement.

II

After concluding that a vendor who agrees to a balloon payment plan should have a reasonable expectation that the vendee may seek funds from a commercial lender, the focus should be on whether a vendor can then frustrate the vendee's attempts to do so. Unlike a mortgage, a land contract will often provide that the vendor has a limited ability to use the property as collateral for other loans during the life of the

---

[10] Deems & Tervo, n 8 *supra*, § 6.6, pp 6-5 to 6-6; Powell, n 1 *supra*, ¶ 938.20[2], p 84D-8.

installment land contract. Therefore, when a vendor takes advantage of this contractual provision and mortgages the property, and those mortgages remain undischarged *on the record* (whether paid off or not), and those undischarged mortgages are the reason why a lender places a condition on the disbursement of the redemption funds, the vendor has in effect prevented unconditional tender. This is not unlike the situation presented in *Karakas v Dost,* 67 Mich App 161; 240 NW2d 743 (1976).

In *Karakas,* the vendees' attorney repeatedly and unsuccessfully tried to locate the vendors' attorney in order to redeem the property. A writ of restitution was entered. On appeal, the vendees' attorney claimed that the vendors' attorney later told him that the vendors had instructed him *not* to accept payment because they wanted to keep the property. The panel held that "actual transfer of the entire amount of money due is generally required for compliance with redemption statutes. A mere showing of ability and intent to pay is insufficient." *Id.* at 167 (citations omitted). However, the panel further stated:

> Nevertheless, case law involving other situations requiring tender of payment holds that valid tender is unnecessary where plaintiff is ready, willing and able to tender, but defendant, by his acts or words, shows that tender would not be accepted. *Hanesworth v Hendrickson,* 320 Mich 577; 31 NW2d 726 (1948), *Ranck v Springer,* 333 Mich 671; 53 NW2d 678 (1952), *Frakes v Eghigian,* 358 Mich 327; 100 NW2d 297 (1960). [*Karakas,* 67 Mich App 167.]

In that same vein, I would hold that the vendor is under a duty to provide the necessary documents to satisfy the vendee's lender's reasonable condition of providing recordable documents to clear title when

(1) it is the vendor's postexecution use of the property that led to the condition and, (2) the vendee has in fact secured the funds before the end of the final day of the redemption period. When that duty has been breached, tender should be excused. Accordingly, in the instant case I would hold that unconditional tender was unnecessary because the vendees were ready, willing, and able to tender before the redemption period had expired but for the conditions imposed by their lender as a result of the vendors' postexecution actions and because the vendors refused to cooperate in satisfying those conditions.

I do not believe that *Grossman Bldg Co v Elliott*, 382 Mich 596; 171 NW2d 441 (1969), precludes this conclusion. First, *Grossman* involved redemption from a foreclosure sale—not a forfeiture. The Court emphasized this fact in stating its concern that to grant relief "would set a dangerous precedent which would deprive every title to real estate purchased at foreclosure sale of the finality and security clearly intended under the statute." *Id.* at 606. In contrast, a forfeiture does not involve a title acquired at a public sale. Until the writ of restitution is entered, legal title has not been altered in any way. Second, it is unclear from the *Grossman* facts whether the mortgage at issue was recorded before or after the foreclosure sale, or even before or after the execution of the land contract. Further, there was no indication that the *Grossman* land contract required a balloon payment, which would be distinguishable from the instant case where the vendors should be reasonably expected to provide clear title in order for the vendees to obtain requisite financing to cover the balloon payment.

And perhaps most importantly, the *Grossman*
Court emphasized that the vendee "did nothing to
preserve her right of redemption until after it had
expired." *Id.* The statutory redemption period expired
on March 30, 1967. And although the vendee's attor-
neys sent a letter to the vendor two weeks before the
end of the redemption period asking for a warranty
deed in order to consummate the loan that would
cover the redemption amount, after receiving the ven-
dor's letter refusing to do so, the vendee *did nothing
further* until April 7, 1967. I do not believe that we
should read *Grossman* as anything more than a "fail-
ure to preserve rights" case. In sharp contrast, the
instant vendees placed the funds in escrow with a
reputable title company *before* the redemption period
had expired. This escrow, which occurred in addition
to the vendors' refusal to cooperate, distinguishes this
case from *Grossman*.

The instant majority's holding that a vendor need
not cooperate will continue effectually to destroy any
meaningful statutory right of redemption. Twenty-five
years ago, Professor Campbell argued:

> The purpose of the Michigan statute is to give the land
> contract vendee a statutory right of redemption not unlike
> that which has long been accorded the mortgagor. The stat-
> ute's enactment surely indicates that the legislature
> intended to give a land contract vendee meaningful redemp-
> tion rights. Yet, in practice, his rights have been substan-
> tially emasculated. With a purchaser or mortgagee ready
> and willing to provide the necessary funds for redemption,
> the vendee, through no fault of his own, is powerless to
> obtain legal title which is vital to complete the funding
> transaction. To get legal title, he must first redeem. As
> noted above, the mortgagor, who retains legal title pending
> expiration of the redemption period, encounters no such
> obstacle. If the vendee can persuade the vendor to place a

deed of legal title in escrow during the redemptive period, the vendee's rights of redemption are substantially enhanced. If the vendor is unwilling to so cooperate, the vendee's redemptive rights are diminished. It becomes apparent then, that in many instances, any meaningful rights of redemption for the vendee exist at the pleasure and in the discretion of the vendor, notwithstanding the redemption statute. [Campbell, *Real Property*, 1970 Annual Survey of Michigan Law, 17 Wayne L R 641, 643 (1971).]

III

Turning to the instant case, I would hold that equitable considerations should prompt us to excuse unconditional tender and to relieve the Flynns from an unreasonable forfeiture. *Rothenberg v Follman*, 19 Mich App 383, 388-389; 172 NW2d 845 (1969). I tend to agree with the majority that a vendee cannot unilaterally set up a closing without reasonable notice to the vendor of the time and place. However, I believe that in this case the original vendors' postexecution mortgages on the property, and attorney Anthony Smereka's failure to record the discharges or to offer them to the Flynns ahead of tender, should factor in favor of equitable relief by excusing tender.[11]

---

[11] The majority places a great deal of emphasis on the fact that there was a recorded warranty deed from the Piuntis to the Korneffels. *Ante* at 192, n 7. A warranty deed, in and of itself, would not necessarily prove clear title when there were undischarged mortgages remaining on the record—especially when those mortgages together total more than the default judgment. The issue is whether the undischarged mortgages placed a cloud on title. (It has long been held that an undischarged land contract on record will cloud title. *Fletcher v Moore*, 42 Mich 577, 579 [1880].) The definition of marketable title has been noted as:

The Michigan courts have defined the term *marketable title* in several cases. In *Barnard v Brown*, 112 Mich 452; 70 NW 1038 (1897), the Michigan Supreme Court said that *marketable title* is title that is free from encumbrance and is of such a character as to

On remand, the district court found that the purchase price of the property was $672,500 and that the market value of the property exceeded the default judgment amount. Further, a title commitment ordered four days before the end of the redemption period revealed undischarged postexecution mortgages on the original vendors' interest totaling $505,000. In contrast, the default judgment was $455,833. It would be commercially reasonable for a lender to question undischarged mortgages that exceed the amount of the requested loan.

Mr. Smereka testified that he expected all along that the Flynns would redeem and that he would have to deliver clear title. His testimony also revealed that he expected the Flynns to acquire the redemption money through a mortgage company. Knowing that undischarged mortgages would cloud title and that

---

assure to the purchaser the quiet and peaceable enjoyment of the premises. . . . In *Madhaven v Sucher*, 105 Mich App 284; 306 NW2d 481 (1981), the court of appeals reaffirmed this rule and said that (1) title may be regarded as unmarketable if a reasonably prudent person, familiar with the facts, would refuse to accept title as presented in the ordinary course of business, and (2) it is not necessary that title actually be bad to render it unmarketable. [1 Cameron, Michigan Real Property Law (2d ed), § 12.4, p 400.]

That being the rule, it is highly persuasive, on the basis of the testimony at the hearing on remand, that the instant property's title was unmarketable without recordable discharges of the record mortgages in hand. Anthony Brinkman, an escrow officer at Lawyer's Title Insurance Corporation (a reputable title company), testified that without valid discharges in hand it would not be safe to draw any conclusions about a subsequently recorded warranty deed. Mr. Smereka, the Korneffels' attorney at the time of the relevant events, testified that undischarged mortgages will affect clear title. He also admitted that he understood that in the normal course of commercial transactions, lending institutions generally will not accept collateral that is subject to another mortgage.

lenders do not loan money on collateral with clouded title, and further expecting that the vendees would be redeeming with money acquired through a mortgage company, Smereka's argument that he did not need to attend a closing or even to cooperate with the vendees' attempts to clear title seems inequitable.

On the morning of the last day of redemption, after being advised by Flynn that the discharges had not been recorded, Smereka stated that he was "surprised" that they were not recorded—even though it had been his obligation to do so. Smereka told Flynn that he would investigate the situation and call back in an hour. He did not call back. Smereka did in fact have possession of the discharges. Instead of offering to provide the discharges, Smereka told Flynn to pay over the money first, and *then* he would produce the requested documents.[12]

It is clear that the Korneffels bought into this land contract dispute for the express purpose of obtaining the property. They did not want the Flynns to redeem. It is also clear that the Flynns in fact did secure the funds for redemption no later than 2:30 P.M. on the last day of redemption and that those funds were escrowed with Lawyers Title Insurance Company.

In denying the Flynns' motion for relief, the district court reasoned "that the land contract vendor was not required to submit the warranty deed and dis-

---

[12] The district court also noted a conversation between Flynn and Smereka in which Smereka stated "he wouldn't walk across the street to accept the money . . . ."

charges or participate in the closing." Because I believe that the instant vendors did have an obligation to submit the discharges in this case, I would hold that *unconditional* tender was excused.

Therefore, I would reverse the lower courts.