*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JESSIE LEE COBB,

      Plaintiff-Appellant,

v

WILLIAM PARKS and PROGRESSIVE
MICHIGAN INSURANCE COMPANY,

      Defendants-Appellees.

UNPUBLISHED
July 30, 2019

No.  342774
Wayne Circuit Court
LC No.  17-001388-NI

Before:  GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Plaintiff, Jessie Lee Cobb, appeals as of right the trial court's orders granting defendants, William Parks and Progressive Michigan Insurance Company (Progressive) summary disposition of plaintiff's negligence claim and claim for no-fault personal protection insurance (PIP) benefits based on a motor vehicle accident.  We affirm.

## I.  BACKGROUND

On August 18, 2016, Parks rear-ended Cobb's pickup truck with his vehicle while Cobb sat stopped at a traffic light at an intersection in Detroit.  Cobb exited his vehicle, walked back to Parks who remained inside his car, became furious and asked him what he was doing.  Cobb looked at his truck and found the right side of his bumper pushed in and a slightly dented fender. Cobb did not notice any damage to Parks's small vehicle.  Cobb and Parks exchanged information, left the scene, and later reported the accident to the police because, in Detroit, in accidents not resulting in serious injury or vehicle damage, parties may go to the police station to report an accident.  Parks testified that he saw no damage to Cobb's vehicle after the accident and that his vehicle sustained some minor damage to its front bumper.  Parks reported the accident to his insurance company but he did not have repairs done to his vehicle.

After Cobb left the accident scene he drove to a woman's house with whom he had arranged to do some home improvement projects.  He told her that he intended to go to the hospital, left her house and went to the emergency room because his back and neck caused him concern.  The hospital treated and released him with instructions to follow up with a neurologist.

-1-

Cobb returned to the woman's house the next day to unload the dirt from his truck with the assistance of two men. He admitted that the day after the accident he unloaded his truck, cut trees, and did some painting at the woman's house. He testified that while performing the work the day after the accident he felt something wrong with his neck so he returned to the emergency room. Hospital personnel gave Cobb a shot and a prescription for pain which he did not fill because he did not like taking pills. Later Cobb consulted with Dr. Alexander Ajlouni (his regular pain management doctor) who ordered an MRI.

Progressive insured Cobb's vehicle. Progressive stated in its submissions to the trial court that Cobb's insurance policy provided:

> This policy was issued in reliance upon information provided on your insurance application. We may void this policy at any time, including after the occurrence of an accident or loss, if you:
>
> 1. made incorrect statements or representations to us with regard to any material fact or circumstance;
>
> 2. concealed or misrepresented any material fact or circumstance; or
>
> 3. engaged in fraudulent conduct; at the time of application. This means we will not be liable for claims or damages that would otherwise be covered.
>
> We may deny coverage for an accident or loss if you or a person seeking coverage has knowingly concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

On August 25, 2016, Cobb communicated with Progressive regarding making a PIP benefits claim. Progressive's claim representative told Cobb to submit an application for benefits and provide the required information. She informed Cobb that his claim was under investigation and that he had substantial preexisting conditions for which he had received treatment for over the past four years. She confirmed that his claim was not denied at the time but that Progressive required additional information including a list of medical providers and authorization to obtain his medical records so that it could determine what injuries related and did not relate to the August 2016 accident.

Cobb submitted an application for no-fault benefits to Progressive that he dated and signed on August 25, 2016. In it he provided a basic description of the August 2016 accident. He reported that he injured his neck, spine, and lower back. In the box on the application form that asked if he received any medical treatment for the same or similar symptoms before the accident, Cobb checked both the yes and no boxes. In the accompanying box he identified Dr. Ajlouni and a pain clinic located in Southfield, Michigan. The benefit application form stated: "Please list physician, hospital, clinic or other medical institution providing care for auto related injuries." In response, Cobb only identified the pain clinic and an entity named Internal Medicine as providers of medical services that those two entities provided to him on August 26, 2016.

On January 19, 2017, Cobb sued Parks and Progressive alleging that Parks's negligent failure to operate his vehicle safely and stop when required caused Cobb "severe, grievous and permanent personal injuries, disability, damages, serious impairment of bodily functions and permanent, serious disfigurement" including "[i]njuries to and about the lumbar and cervical spine necessitating a lumbar fusion surgery and cervical spine fusion surgery, and sequelae" and injuries "to his head, shoulders, entire neck, back and spine" and injuries "to and about the entire musculoskeletal system." Cobb specifically alleged that Progressive entered a contract for auto insurance with him that entitled him to recover no-fault PIP benefits from Progressive pursuant to MCL 500.3101 *et seq.* He alleged that Progressive wrongly refused to pay his medical expenses and for replacement services despite having been presented proof of loss and allowable expenses that arose from the 2016 accident in violation of the no-fault act. Parks and Progressive answered the complaint and denied any liability.

The parties engaged in discovery through which defendants obtained Cobb's medical records and deposition testimony. Progressive moved for summary disposition on the ground that Cobb falsified information in his application for PIP benefits, application for replacement services, and during its investigation of his claims for benefits in violation of the terms of his insurance policy. Progressive relied on *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420 (2014), among other cases, for the proposition that Cobb's misrepresentations constituted fraudulent conduct that fell within its policy's fraud and misrepresentation exclusion that permitted it to deny Cobb PIP benefits and void his policy. Progressive supported its motion with Cobb's medical records, his deposition testimony, a physician's expert analysis of the accident and Cobb's medical records, an accident reconstruction report that concluded that the 2016 accident involved a collision by Parks's vehicle at a speed of approximately four to nine miles per hour, and a surveillance report with photographs depicting Cobb doing various energetic physical activities during the period for which Cobb sought benefits for replacement services.

Parks moved for summary disposition on the ground that Cobb could not establish that, as a result of the August 2016 accident, he suffered a serious impairment of a body function that affected his general ability to lead his normal life as required under MCL 500.3135. Parks relied on Cobb's medical records and deposition testimony. Cobb opposed their motions. In response to Progressive's motion he argued that he made no misrepresentations in his applications for benefits and relied on a selection of his medical records related to treatment provided to him after the 2016 accident and a letter procured by his counsel from his surgeon to support his contention that the accident exacerbated his condition. In response to Parks's motion, Cobb argued that the analysis required by *McCormick v Carrier*, 487 Mich 180; 795 NW2d 517 (2010) required the trial court to rule that Cobb established that he suffered from an objectively manifested impairment of a bodily function that affected his general ability to lead his normal life. Following a hearing, the trial court granted defendants' respective motions and dismissed Cobb's case.

## II. STANDARD OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition under MCR 2.116(C)(10). *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008), reh den 481 Mich 882 (2008). A motion brought pursuant to MCR 2.116(C)(10) tests the factual support of a plaintiff's claim and is reviewed "by considering the

-3-

pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. When opposing a properly asserted and supported motion for summary disposition under MCR 2.116(C)(10), the nonmoving party cannot rely on mere allegations or denials in his or her pleadings to establish a question of fact. See *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). Rather, the nonmoving party must present at least some evidentiary proof, some statement of specific fact upon which to base his case. *Maiden v Rozwood*, 461 Mich 109, 120-121; 597 NW2d 817 (1999), reh den 461 Mich 1205 (1999); *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). A genuine issue of material fact exists "when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

This Court also reviews de novo questions of statutory interpretation and the proper interpretation of a contract. *Titan Ins Co v Hyten*, 491 Mich 547, 553; 817 NW2d 562 (2012). This Court reviews de novo the interpretation of an insurance contract just like any other contract. *Healing Place at North Oakland Med Ctr v Allstate Ins Co*, 277 Mich App 51, 55; 744 NW2d 174 (2007). This Court "look[s] at the language of the insurance policy and interpret[s] its terms in accordance with the principles of contract construction. Where there is no ambiguity, an insurance contract must be enforced as written in accordance with its terms." *Allstate Ins Co v Muszynski*, 253 Mich App 138, 141; 655 NW2d 260 (2002) (citation omitted).

## III. ANALYSIS

Cobb argues that the trial court erred by granting Progressive's motion because he never misrepresented any facts in relation to his claim for PIP benefits. We disagree.

The record reflects that Progressive relied on this Court's *Bahri* decision and the trial court found that case applicable and dispositive of Progressive's motion for summary disposition. In *Bahri*, the plaintiff sued for PIP benefits from the defendant insurer who declined to pay for replacement services because the plaintiff sought payment for services she received before her motor vehicle accident occurred. *Bahri*, 308 Mich App at 421-422. Further, the insurer submitted to the trial court for its consideration a surveillance video that showed the plaintiff doing tasks that she claimed she was unable to perform. *Id*. at 422. The insurer moved for and the trial court granted it summary disposition under MCR 2.116(C)(10), on the ground that the fraud exclusion provision in the plaintiff's insurance policy barred her claim. *Id*. This Court agreed with the trial court's conclusion that the fraud exclusion applied. *Id*. at 425. This Court approved the trial court's consideration of the "surveillance evidence that depicted the plaintiff performing activities inconsistent with her claimed limitations." *Id*. This Court found it particularly noteworthy that the surveillance evidence captured the plaintiff doing various household activities for which she sought replacement services. *Id*.

This Court affirmed because the evidence of her claim for preaccident replacement services and the surveillance video "belie[d] plaintiff's assertion that she required replacement services, and it directly and specifically contradict[ed] representations made in the replacement services statements." *Bahri*, 308 Mich App at 426. This Court concluded that "reasonable

-4-

minds could not differ in light of this clear evidence that plaintiff made fraudulent representations for purposes of recovering PIP benefits. Stated differently, we find no genuine issue of material fact regarding plaintiff's fraud." *Id*.

In *Bahri*, this Court reiterated the test for establishing fraud or false swearing:

> To void a policy because the insured has wilfully misrepresented a material fact, an insurer must show that (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim. [*Id*. at 424-425 (citation omitted).]

"Initially, in reviewing an insurance policy dispute we must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction." *Henderson v State Farm Fire & Cas Co,* 460 Mich 348, 353; 596 NW2d 190 (1999). "The language in an insurance contract should be read as a whole, and we construe the language to give effect to every word, clause, and phrase." *Bahri*, 308 Mich App at 423. Where an insurance policy contains clear and unambiguous contract language, this Court "must enforce the specific language of the contract." *McGrath v Allstate Ins Co*, 290 Mich App 434, 439; 802 NW2d 619 (2010). Further, "[a] court must not hold an insurance company liable for a risk that it did not assume." *Henderson*, 460 Mich at 354.

In this case, Progressive represented to the trial court that Cobb's insurance policy provided:

> We may deny coverage for an accident or loss if you or a person seeking coverage has knowingly concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim. [See Progressive's Summary Disposition Motion, p 3; Progressive's Brief in Support of Motion for Summary Disposition, p 21.]

Progressive did not attach a copy of the policy it issued to Cobb as an exhibit to its summary disposition motion or supporting brief. Cobb contends for the first time on appeal that Progressive's failure to attach the policy requires reversal of the trial court's ruling in favor of Progressive. Cobb argues that, for Progressive to support its position, it had to meet the requirements of MCR 2.116(G)(6)[1] by attaching his policy to prove that it contained the fraud

---

[1] MCR 2.116(G)(6) provides:

> Affidavits, depositions, admissions, and documentary evidence offered in support of or in opposition to a motion based on subrule (C)(1)—(7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion.

and misrepresentation exclusion provisions. Cobb asserts in his appeal brief that his insurance policy "may" not contain the fraud and misrepresentation provisions on which Progressive relied. Cobb essentially argues that the trial court could not render a decision in favor of Progressive without looking at the actual policy document to determine what his policy stated. Cobb, however, never raised this issue before the trial court or even intimated that his policy did not contain the fraud and misrepresentation provisions on which Progressive relied.

Michigan generally follows a raise or waive rule of appellate review. *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008). Although the Michigan Supreme Court has held that this Court must review unpreserved errors in criminal cases for plain error affecting the defendant's substantial rights, see *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), it has not established a similar holding for civil cases. See *Walters*, 481 Mich at 387-388; see also *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 377-378; 761 NW2d 353 (2008) (stating that the failure to properly raise a claim of error before the trial court in a civil case normally constitutes a waiver of that claim and declining to exercise its discretion to review the unpreserved claim under the facts of that case).

Nevertheless, this Court has discretion to overlook preservation requirements. See *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006) (stating that this Court may overlook preservation requirements where the failure to consider the issue would result in a manifest injustice, or if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented). This Court will review forfeited issues when declining to do so would result in a miscarriage of justice. *Brown v Loveman*, 260 Mich App 576, 599; 680 NW2d 432 (2004). However, this Court exercises such discretion sparingly and only where exceptional circumstances warrant review. *Booth v Univ of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993).

We do not find that this case presents exceptional circumstances warranting review of this aspect of Cobb's claim of error. Cobb waived any claim of error regarding Progressive's reliance on the language in his policy. Progressive recited in its motion and supporting brief the language of its no-fault auto insurance policy issued to Cobb. Cobb had the opportunity to challenge the accuracy of Progressive's representation of the language in his policy by submitting evidence, if any existed, of contrary language or evidence that his policy did not contain the fraud and misrepresentation provisions on which Progressive relied. This issue should have been raised by him before the trial court so that it could determine the validity of his assertion. Significantly, Cobb does not deny that he contracted with Progressive for his auto insurance and that Progressive issued him a policy. Even on appeal Cobb does not and apparently cannot establish that his policy did not contain the fraud and misrepresentation provisions on which Progressive relied. He merely states that it "may" not have stated the language Progressive recited in its motion and brief. We find no exceptional circumstances that warrant our giving credence to Cobb's argument. We conclude that Cobb cannot show that his policy lacked the fraud and misrepresentation provisions on which Progressive relied or that his policy's language differed from Progressive's standard language found in Progressive's policies

issued in Michigan.[2]  As explained herein, reasonable minds could not differ in light of the evidence presented by Progressive that plaintiff made fraudulent representations for purposes of recovering PIP benefits.  Accordingly, we decline to consider this aspect of Cobb's claim of error.

Further, Cobb essentially advances the argument that, if an insurance policy does not expressly state that no benefits are recoverable if an insured fraudulently misrepresents his injuries and conditions before and after an accident, then an insured is free to say anything to the insurer and still recover PIP benefits regardless of the veracity of his representations.  That proposition is neither supported by Michigan contract law nor the no-fault act.  MCL 500.3105(1) provides in relevant part that an "insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle[.]"  "Accordingly, a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident."  *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 531; 697 NW2d 895 (2005).  "It is not any bodily injury that triggers an insurer's liability under the no-fault act.  Rather, it is only those injuries that are caused by the insured's use of a motor vehicle."  *Id*.

Michigan contract law and the no-fault act do not support imposing performance obligations upon insurers to pay benefits, or imposing liability for not doing so, if the insured makes misrepresentations in his application or during the investigation of his claim for no-fault benefits by the insurer.  "Insurance policies are contracts and, in the absence of an applicable statute, are subject to the same contract construction principles that apply to any other species of contract."  *Titan Ins Co v Hyten*, 491 Mich 547, 554; 817 NW2d 562 (2012) (quotation marks and citation omitted).  Because insurance policies are contracts, common-law defenses including fraud may be asserted to avoid enforcement of an insurance policy so long as that defense is not prohibited by statute.  *Id*. at 554-555.  It is well settled under Michigan law that parties to a

_____

[2] Moreover, although Progressive concedes that it did not present the trial court a copy of the subject policy, it submits that Cobb's policy contained the standard fraud and misrepresentation provisions that all auto insurance policies issued in Michigan contain.  Progressive explains that it filed its standard Michigan auto insurance policy with and obtained approval from Michigan's Department of Insurance and Financial Services and its standard policy is readily accessible on the Internet at https://filingaccess.serff.com/sfa/home/MI.  Under MRE 201(b), courts may take notice of certain adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Further, judicial notice of facts may be taken at any stage of the proceedings including at the appellate level.  MRE 201(e); *Hetrick v Friedman*, 237 Mich App 264, 269; 602 NW2d 603 (1999), disagreed with on other grounds *Wold Architects and Eng v Strat*, 474 Mich 223; 713 NW2d 750 (2006).  In this case, Progressive's standard policy is publicly available through Michigan's Department of Insurance and Financial Services official website and the source does not appear to be one that can reasonably be questioned.  Therefore, this Court may take judicial notice of the fact that Progressive's standard auto insurance policy contained the fraud and misrepresentation provisions on which Progressive relied.

contract have a duty of good faith and fair dealing in both their performance and the enforcement of the contract. *Flynn v Korneffel*, 451 Mich 186, 213, n 8; 547 NW2d 249 (1996), citing 2 Restatement, Contracts 2d, § 205, p 99. It is axiomatic that Michigan law does not support the proposition that a party to a contract can misrepresent facts to obtain performance by the other contracting party. The fundamental principle that insureds must honestly state their claims for PIP benefits, honestly assist insurers in claim investigations, and not misrepresent facts to obtain benefits, upholds the letter and spirit of Michigan's no-fault law. Indeed, in MCL 500.3148(2), the Legislature supported this principle by providing for an insurer's recovery of attorney fees in cases where the insurer must defend "against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation." As a contracting party, Progressive had the right to insist that Cobb base his claim on true, accurate, and complete information, and honestly assist his insurer in its investigation, before Progressive performed by paying him PIP benefits. Therefore, as a matter of basic contract law, Progressive had entitlement to investigate Cobb's claims for benefits and deny performance if Cobb fraudulently sought benefits, failed to provide true, accurate, and complete information, and failed to honestly assist Progressive in its investigation of his claim.

We now must address whether de novo review of the record supports the trial court's grant of summary disposition to Progressive on the grounds that Cobb committed fraud or misrepresentations to obtain PIP benefits. To establish the contract defense of actionable fraud, Progressive had to show that Cobb knowingly or recklessly made a material misrepresentation of fact that he knew was false when he made it, and he did so with the intent that Progressive act upon it. *Bahri*, 308 Mich App at 424-425. "A statement is material if it is reasonably relevant to the insurer's investigation of a claim." *Id*. at 425.

In this case, Progressive supported its motion with documentary evidence including Cobb's applications for benefits and replacement services, numerous medical records, and Cobb's own deposition testimony. The record reflects that Cobb communicated with Progressive's representative on August 25, 2016, before he submitted his application for benefits. That representative went over each individual page of Progressive's application for benefits form and confirmed that he needed to send Progressive the application for benefits with a list of his providers and doctors information along with a medical authorization form. She specifically advised him that his claim for PIP benefits was under investigation based upon his substantial preexisting conditions of which Progressive had notice that he treated with the same doctor for pain management for over four years. The representative advised further that a claim adjuster would request records so that a review could determine what conditions related to the 2016 accident. Cobb does not dispute that he received these instructions and information from Progressive before he completed and submitted his application for benefits to Progressive.

The record indicates that, in his application for benefits signed on August 25, 2016, Cobb failed to provide Progressive a complete and accurate list of all of his medical providers and he specifically withheld information about medical providers and treatment that he indisputably received before the 2016 accident. Cobb's explanation for the inadequacies of his application for benefits lacks merit particularly in light of his having been told in detail precisely what Progressive needed from him to determine his claim. Under this set of undisputed facts, reasonable minds could not differ regarding Cobb's failure to provide Progressive true, accurate, and complete information in his application for benefits.

Based upon Cobb's extensive medical records presented to the trial court, reasonable minds also could not differ regarding the extent of and seriousness of Cobb's preexisting conditions respecting his cervical, thoracic, and lumbar spine. Additionally, the evidence of the 2016 motor vehicle accident did not support Cobb's claim that he was involved in an accident from which he suffered any injuries or even an exacerbation of his preexisting conditions. Unrebutted evidence in the record indicated that the 2016 accident involved a very low speed impact that caused only cosmetic damage to the involved vehicles and no deployment of airbags. One cannot reasonably conclude that Parks impacted Cobb's pickup at 40 miles per hour as Cobb told the hospital personnel and reiterated to his physician Dr. Park. The record evidence does not logically support the proposition that a vehicle traveling at 40 miles per hour striking a stationary pickup with a load of dirt could sustain virtually no damage or deployment of its airbags. Cobb's representations regarding the accident to the hospital and his doctor defy the laws of physics. The photo of Cobb's pickup after the 2016 accident that Progressive submitted for the trial court's consideration depicted the rear of his vehicle with nothing more than cosmetic damage. Cobb proffered no evidence to establish an accident that could cause injury or exacerbate his preexisting conditions.

The record also reflects that Cobb neglected or failed to fully cooperate with Progressive so that it could acquire copies of his medical records to enable it to determine the merits of his claim for PIP benefits. In its motion for summary disposition, Progressive informed the trial court of Cobb's serious uncooperative conduct from August 2016 through August 2017. Cobb neither denied Progressive's contention nor offered any explanation for his derelict conduct in failing to timely provide authorization to Progressive and access to his medical records so that it could complete its investigation.

At his deposition, Cobb testified repeatedly that he had no neck or back problems for years before the 2016 accident. Gradually, as he faced repeated challenges to his denials and faced questioning regarding his extensive medical records that plainly contradicted his testimony, Cobb conceded that he had preexisting conditions for which he received treatment for many years before the 2016 accident. He ultimately admitted that during August 2016 just shortly before the accident he received pain treatments for his spine. Contrary to his contentions on appeal, the record reflects that Cobb had no problems with his memory nor did he lack the mental ability to understand the questions posed to him. The application for benefits that Cobb submitted to Progressive made no mention of Cobb's substantial well-documented preexisting medical conditions.

After extensive questioning, Cobb also admitted that he had been determined disabled in 2013 and had not worked a regular job since. He admitted that he had held no employment after 2013 and only did odd jobs for cash. Cobb's testimony reveals that he responded with false denials unless and until directly challenged with the truth of his serious preexisting conditions which were thoroughly documented over numerous years in his medical records. Cobb's medical records established unequivocally that he had involvement in a number of motor vehicle accidents that caused him injuries to his cervical, thoracic, and lumbar spine for which he sought and received ongoing treatment from 2007 right up to the time of the 2016 accident, none of which were disclosed or described in his initial application for no-fault benefits in the instant case. Cobb's medical records also indicated that medical providers recommended spine surgery on more than one occasion before the 2016 accident because of his significant degenerative disc

disease and ongoing serious problems with his back and neck. His medical records belied Cobb's contention that he was getting better and that the 2016 accident caused him the injuries for which he indisputably received treatments over many years leading up to the accident. Cobb's medical records also contradicted his later claim that the accident exacerbated his condition.

Progressive submitted for the trial court's consideration mechanical engineer and neurologist Dr. David Brenner's unrebutted opinion that (1) Cobb's injuries were not the result of the August 2016 accident, (2) Cobb had preexisting degenerative disc disease of the neck and back before the August 2016 accident, (3) Cobb was diagnosed before the 2016 accident with cervical and lumbar radiculopathy, (4) Cobb's neck and back surgeries were performed for his preexisting degenerative disc disease of his neck and back which were not caused by the August 2016 accident. De novo review of Cobb's medical records supports Dr. Brenner's conclusions. Cobb proffered no substantive admissible evidence to rebut these conclusions. Instead, he offered his surgeon's letter to his attorney in which he stated only that he believed the 2016 accident may have exacerbated Cobb's preexisting condition. A close reading of Dr. Park's letter, however, does not permit one to reasonably conclude that the statements made therein created a genuine issue of material fact because he did not render a definitive opinion. Moreover, the letter reveals that he premised his conclusion on Cobb's unsupported representation that Parks's vehicle hit his pickup while "going at least 40 miles per hour."

Regardless, considering the totality of the evidence in the record, reasonable minds could not differ on the issue that Cobb intentionally misrepresented material facts about his condition in his application and throughout Progressive's investigation of his claim for benefits. Reasonable minds also could not differ on the issue that Cobb did so with the intent to have Progressive act on his material misrepresentations and omissions to secure PIP benefits. Therefore, the trial court did not err by ruling that Cobb made misrepresentations that entitled Progressive to deny him PIP benefits.

Cobb's contention that Progressive could not rely on the accident reconstruction report or the surveillance report and that the trial court reversibly erred by considering them also lacks merit. Those reports were unrebutted by Cobb and he failed to raise before the trial court any objections to them or provide the trial court evidence that called the facts on which they were based into question. Accordingly, Cobb waived appellate review of his claim that the trial court erred by considering this evidence.

Further, the accident reconstruction report, albeit not in admissible form, contained evidence that would be admissible at trial and supported by the expert witness testimony of its author. This Court has explained that, "while a motion for summary disposition must be supported by admissible evidence, that evidence does not have to be in admissible form" at the summary disposition stage of the proceedings. *Latits v Phillips*, 298 Mich App 109, 113; 826 NW2d 190 (2012), quoting *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 373, 775 NW2d 618 (2009). Trial courts have discretion to recognize the qualifications of a witness as an expert and also to admit proposed expert testimony. *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007). Here, the trial court had not ruled on the proposed expert's qualifications or the admissibility of the expert's anticipated testimony reflected in the accident reconstruction report. But the report indicated that the expert had the

requisite education, training, and experience regarding the specialized area of accident reconstruction and reflected that the expert applied basic laws of physics to the evidence, establishing that his specialized knowledge would assist the trier of fact to understand the evidence or to determine a fact in issue. To the extent that the proposed expert's report summarized testimony that would be admissible at trial, the trial court could consider it on a motion for summary disposition. MCR 2.116(G)(6); *Maiden*, 461 Mich at 123-124 n6. Therefore, the trial court did not err by considering this evidence.

Respecting the surveillance report, during the summary disposition hearing, Cobb admitted that the report and accompanying photos were what they were. He essentially conceded the veracity of the report regarding his physical activities during the period for which he sought replacement services. This Court may conclude as it did in *Bahri*, that the surveillance report showed his level of physical activity during the relevant time and that his conduct belied his assertion that he required replacement services for the period for which he sought them. Therefore, the trial court did not err by considering this evidence.

Although substantively admissible evidence submitted at the time of the summary disposition motion must be viewed in the light most favorable to the party opposing the motion, the non-moving party must come forward with at least some evidentiary proof, some statement of specific fact upon which to base his case. *Maiden*, 461 Mich at 120-121. In this case, Cobb failed to do so. The evidence preponderated against his claim and he produced no evidence to establish the existence of a genuine issue of material fact. Therefore, the trial court did not err by granting Progressive summary disposition because it concluded based on the evidence that Cobb intentionally misrepresented material facts to obtain PIP benefits and failed to establish a genuine issue of material fact to support his case. Because of Cobb's misrepresentations, Progressive was entitled to deny him PIP benefits.

Cobb also argues that the trial court erred by granting Parks summary disposition. We disagree.

In a third-party automobile negligence action, the plaintiff must not only prove that the injury was caused by the alleged accident but also that the injury met the no-fault threshold to impose tort liability on the defendant. MCL 500.3135 provides in relevant part:

> (1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of a body function, or permanent serious disfigurement.

> (2) For a cause of action for damages pursuant to subsection (1) filed on or after July 26, 1996, all of the following apply:

> (a) The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

> (*i*) There is no factual dispute concerning the nature and extent of the person's injuries.

-11-

(*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

\* \* \*

(5) As used in this section, "serious impairment of body function" means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.

In *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010), our Supreme Court explained:

On its face, the statutory language [of MCL 500.3135(5)] provides three prongs that are necessary to establish a "serious impairment of body function": (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life.

"[A]n 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions." *Id*. at 196. The Supreme Court explained that MCL 500.3135(5), however, "does not contain the word 'injury,' and, under the plain language of the statute, the proper inquiry is whether the impairment is objectively manifested, not the injury or its symptoms." The focus of the inquiry, therefore, must be on whether the plaintiff suffered an impairment which "is the 'state of being impaired' " which "means being 'weakened, diminished, or damaged' or 'functioning poorly or inadequately.' " *Id*. at 197 (citations omitted). "Accordingly, when considering an 'impairment,' the focus is not on the injuries themselves, but how the injuries affected a particular body function." *Id*. (quotation marks and citation omitted). The Supreme Court reaffirmed the principle that "showing an impairment generally requires medical testimony." *Id*. at 198 (citation omitted). It explained further that, if "there is an objectively manifested impairment of body function, the next question is whether the impaired body function is 'important.' " *Id*. Our Supreme Court directed:

Finally, if the injured person has suffered an objectively manifested impairment of body function, and that body function is important to that person, then the court must determine whether the impairment "affects the person's general ability to lead his or her normal life." [*Id*. at 200.]

\* \* \*

[T]o "affect" the person's "general ability" to lead his or her normal life is to influence some of the person's power or skill, i.e., the person's capacity, to lead a normal life. [*Id*. at 201.]

\* \* \*

[T]he common understanding of "to lead his or her normal life" is to live, or pass life, in his or her normal manner of living. [*Id*. at 202.]

Therefore, the plain text of the statute and these definitions demonstrate that the common understanding of to "affect the person's ability to lead his or her normal life" is to have an influence on some of the person's capacity to live in his or her normal manner of living. By modifying "normal life" with "his or her," the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident. [*Id*.]

\* \* \*

First, the statute merely requires that a person's general ability to lead his or her normal life has been affected, not destroyed. Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected.

Second, and relatedly, "general" modifies "ability," not "affect" or "normal life." Thus, the plain language of the statute only requires that some of the person's ability to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected. Thus, while the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is, there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected.

Third, and finally, the statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on "the person's general ability to live his or her normal life." [*Id*. at 202-203.]

In *McCormick*, 487 Mich at 215, our Supreme Court stated that the proper interpretation of the clear and unambiguous language in MCL 500.3135 creates the following test:

To begin with, the court should determine whether there is a factual dispute regarding the nature and the extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. MCL 500.3135(2)(a)(*i*) and (*ii*). If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court. *Id*.

If the court may decide the issue as a matter of law, it should next determine whether the serious impairment threshold has been crossed. The unambiguous language of MCL 500.3135([5]) provides three prongs that are necessary to establish a "serious impairment of body function": (1) an objectively manifested impairment (observable or perceivable from actual symptoms or

-13-

conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living).

This Court recently explained in *Piccione v Gillette*, ___ Mich App ___; ___ NW2d ___ (2019), slip op at 3, in relation to determining whether the plaintiff suffered a serious impairment:

> In making that determination, "there is no bright-line rule or checklist to follow[.]" *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 N.W.2d 88 (2011). Instead, "[w]hether someone has suffered a serious impairment is 'inherently fact-and circumstance-specific and [the analysis] must be conducted on a case-by-case basis.' " *Id.*, quoting *McCormick*, 487 Mich. at 215 (brackets in original).

In this case, Parks relied on Cobb's medical records and his deposition testimony to establish Cobb's preaccident physical condition. Based on that evidence, Parks argued that Cobb failed and could not establish that the 2016 accident caused him any injury that could be considered an impairment that affected his general ability to lead his normal life. In *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017), our Supreme Court clarified that

> a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries. In a negligence action, a plaintiff must establish both factual causation, i.e., the defendant's conduct in fact caused harm to the plaintiff, and legal causation, i.e., the harm caused to the plaintiff "was the general kind of harm the defendant negligently risked. If factual causation cannot be established, then proximate cause, that is, legal causation, is no longer a relevant issue. [Quotation marks and citations omitted.]

The record reflects that Cobb's medical records and his deposition testimony indicated that Cobb's preaccident baseline condition of neck, thoracic, and lumbar pain and suffering were severe requiring ongoing treatment right up to the time of the 2016 accident. Further, Cobb's degenerative disc disease had advanced before the 2016 accident to a level that treating physicians recommended surgical intervention. Before the 2016 accident, the evidence of record indicates that Cobb had been diagnosed disabled from work and although he did odd jobs for cash, his normal life activities were impacted by his back and neck conditions, as well as his knee problem, shoulder problem, and other maladies. Although the evidence established that Parks caused the 2016 accident, the evidence did not establish that the accident caused Cobb's injuries. Objective analysis of Cobb's extensive serious preexisting conditions does not support Cobb's contention that he suffered any injury or an exacerbation of his condition. Cobb failed to submit substantive admissible evidence that established the cause in fact and proximate cause elements of his claim against Parks. Even assuming that he could, the record does not support his assertion that the 2016 accident caused an impairment that affected his general ability to lead his normal life.

The record contains evidence regarding Cobb's postaccident condition. Immediately following the accident, Cobb drove to the house of a person with whom he had contracted to provide services. He did not require an ambulance to transport him to the hospital. Two and one half hours after the accident, he drove himself to the hospital. At the hospital, medical personnel examined and discharged Cobb after administering some pain medication and giving him a prescription. The hospital records indicate that hospital personnel knew of Cobb's previous treatments for the condition about which he complained, a condition they considered chronic, not acute. Although Cobb later underwent surgeries for his neck and lumbar spine after the 2016 accident, de novo review of the record does not establish that the surgeries and his postsurgery treatment were necessitated by the 2016 accident. His previous diagnosis of degenerative disc disease had led treatment providers to recommend the same surgeries but he declined to do so.

Further, when questioned regarding how the 2016 accident affected his general ability to lead his normal life, Cobb only testified that it affected his sex life. When asked to explain how, he stated that he was single and before the accident he had frequent sexual relations each week, but after the accident he had sexual relations only four times. When pressed further, Cobb admitted that his sexual relations issues had been going on for quite a while because of his left knee which had nothing to do with his 2016 accident but arose from an earlier motor vehicle accident. Cobb also testified that after the 2016 accident he chose not to engage in sex because he had mixed emotions that impacted his passion. He admitted that no doctor restricted him from sexual activities. Cobb also initially attributed his lack of church attendance after the 2016 accident to the accident, but when challenged he testified that he simply stopped going because the church's members had not supported him after his accident to his liking. Cobb offered no testimony regarding any activities that he could not do after the 2016 accident that he had done before the accident.

Parks also relied on the surveillance report. That report presented photographs depicting Cobb walking extended distances without problem, walking up and down steps without problem, and jumping from parking curb top to parking curb top without problem, all of which supported the position that Cobb did not lack mobility or postaccident physical impairment.

Analysis of the record evidence establishes that Cobb failed to demonstrate the existence of a genuine issue of material fact regarding the determination whether he met the serious impairment threshold. Although Cobb complained of pain in his neck and back after the 2016 accident, the record does not support a conclusion that he suffered an injury in the 2016 accident that required the surgeries he underwent. Further, the evidence, even when viewed in the light most favorable to Cobb, does not support his contention that he suffered an impairment as a result of the 2016 accident that impacted his life. Although he demonstrated that he had serious neck and back problems diagnosed by his doctors, the evidence established that those conditions indisputably existed for a long time before the 2016 accident and required ongoing treatments for a significant number of years right up to August 2016 and caused his doctors to recommend surgery before the 2016 accident.

The evidence also does not support Cobb's contention that his impairment affected his general ability to lead his normal life. The record in this case permits a preaccident to postaccident comparison. Other than the fact that Cobb had neck and back surgeries followed by a short period of recuperation, the evidence presented by defendants in the surveillance report

established that, by February 2017, Cobb had experienced recovery to his preaccident baseline. Cobb admitted that he self-imposed the restrictions on his activities and that no doctor ordered any restrictions.

Unlike the plaintiff in *McCormick*, whose broken ankle, symptoms, and conditions arose indisputably from his accident, and his normal manner of living, including his ability to work and engage in his hobbies, were also indisputably affected, the record in this case lacks evidence establishing that Cobb suffered any impairment to his general ability to lead his normal life.

This case also differs from *Piccione* where the plaintiff, a three-year-old child, indisputably suffered a broken arm as a result of a motor vehicle accident which indisputably interfered with his general ability to lead his normal life because he could not attend school and when he did he could not play on the school equipment. Further, in *Piccione*, evidence established that after his accident, the plaintiff could not dress himself, needed help traversing stairs because of balance problems, could not sleep because of pain, and did not do other activities like coloring, sports, and bike riding. *Piccione*, ___ Mich App at ___; slip op at 3-4. The record in this case lacks evidence of any changes after the 2016 accident to Cobb's general ability to lead his normal life. The record reflects that the day after the accident, Cobb did several odd jobs at the person's house with whom he had contracted to perform services. Other than the fact that he had surgeries for his chronic neck and back conditions and went through a period of recuperation, Cobb presented no evidence that the 2016 accident caused an impairment that affected his general ability to lead his normal life.

The record reflects that Parks met his burden as the moving party to present sufficient evidence to demonstrate that any impairment of a body function did not affect Cobb's general ability to live his normal life. Once Parks did so, the burden shifted to Cobb to demonstrate with admissible evidence the existence of a genuine issue of material fact otherwise. *Smith v Globe Life Ins Co*, 460 Mich 446, 455; 597 NW2d 28 (1999). Cobb failed to present substantive admissible evidence to establish that his normal manner of living changed.

De novo review of the record in this case establishes that Cobb failed to satisfy all three prongs of MCL 500.3135(5). Cobb failed to establish (1) an objectively manifested impairment caused by the 2016 accident (2) of an important body function that (3) affected his general ability to lead his normal life. *McCormick*, 487 Mich at 215. Therefore, as a matter of law, Cobb failed to meet the serious impairment threshold under MCL 500.3135(1). Accordingly, the trial court did not err by ruling that, as a matter of law, Cobb failed and could not meet the serious impairment threshold under MCL 500.3135(1). Therefore, the trial court appropriately granted Parks summary disposition.

We hold that the trial court did not err by granting Progressive summary disposition because de novo review of the record establishes that, viewing the record in the light most favorable to Cobb, reasonable minds could not differ on the issue that Cobb made misrepresentations of material fact in his applications for PIP benefits which justified Progressive's decision to deny Cobb benefits. We also hold that the trial court did not err by granting Parks summary disposition because Cobb failed to establish that he suffered a serious

objectively manifested impairment of a body function caused by the 2016 accident that affected his general ability to lead his normal life.

Affirmed.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford